# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS-ATTLEBORO DISTRICT COURT

CASE NO.: 2234CV730152

NATALIE ANDERSON; ANDRE BISASOR; Plaintiffs

v.

TODISCO SERVICES INC.;
PASQUALE TODISCO III;
MATTHEW MAZZARELLA;
DON "DOE"; BILLY "DOE";
MAPFRE INSURANCE COMPANY;
STEPHANIE WOJDAG;
DANIEL OLOHAN;
ACADIA INSURANCE GROUP;
BENNETT & BELFORT;
JITEN MANAGEMENT;
Defendants.

## AMENDED COMPLAINT AND DEMAND FOR JURY

### I. INTRODUCTION

1. The plaintiffs (Natalie and Andre) in the above captioned case (hereinafter also referred to as "plaintiffs", and Natalie, as the main/primary plaintiff, is also referred to in the first person "I", "my", "me" or individually in the third person as simply "plaintiff") hereby submit this **amended** complaint for claims of negligence, unfair & deceptive practices (including but not limited to violations of the Massachusetts law governing towing/towing operations), emotional damages and other wrongs, all of which have caused the plaintiffs injury and damages. These claims are made against the defendants captioned above, pursuant to Massachusetts General Laws, Chapter 93A ("93A"), as a result of the unfair and deceptive practices by Todisco Services Inc. ("Todisco") and its employees, MAPFRE Insurance Company ("MAPFRE") and its employees, and Acadia Insurance Group ("Acadia") and Jiten Management ("Jiten"), collectively referred to as the "Defendants". Plaintiffs demands compensation for damages including double or treble damages for violations under 93A.

### II. PARTIES

2. The plaintiffs (Natalie and Andre) are spouses and are individuals/citizens of Massachusetts with an address of 679 Washington Street, 8-206, Attleboro, MA 02703. The plaintiffs have been harmed and injured by the acts of the defendants and assert claims directly against the defendants. The plaintiffs are the owners of the vehicle that was damaged by Todisco (as outlined in this complaint) and have ownership and financial interest in the vehicle damaged by Todisco. In addition, damage to the vehicle by Todisco resulted in injury and harm directly to the plaintiffs. The vehicle was paid for by the plaintiffs and represented an investment by the plaintiffs from their own cash savings. Every diminution in value to the vehicle caused by Todisco's damage results in destruction of value of the plaintiff's direct investment in the purchase and maintenance of their vehicle. The plaintiffs were told by a car dealership that the damage to the vehicle resulted in thousands of dollars' worth of diminution of value including but not limited to the cost of repairs and the fact that the vehicle would be classified as one that had been damaged in an accident. The plaintiffs also relied on their vehicle for work and business. The damage to the vehicle and the attendant inconvenience of repairs and downtime in a repair shop for both estimates and repairs resulted in actual direct harm and injury to the plaintiff's economic interests and livelihood. The plaintiffs were also harmed directly by the unfair and deceptive acts by Todisco in the unfair debt collection practices by Todisco and in coercing payment from plaintiffs and tricking the plaintiffs into signing paperwork that was misrepresented to be a receipt. Also, by hiding the vehicle from plaintiff and refusing to show plaintiff the vehicle unless payment was made and paperwork was signed, Todisco harmed the plaintiffs through unfair and deceptive acts. The plaintiffs were further harmed by the unfair and deceptive acts of Todisco's insurers as outlined in this complaint. The plaintiffs, as hotel guests of Jiten, were also directly harmed by the acts of Jiten, which acts were unfair and deceptive and directly led to the towing of the vehicle. The harm, injury and damages sustained by the plaintiffs will be further elucidated in the below complaint.

1

3. Defendant **Todisco Services, Inc.**, is a Domestic Profit Corporation with a principal place of business at 171 Boston Street, Salem, MA 01970. Its registered agent in Massachusetts is Pasquale Todisco III, at 171 Boston Street, Salem, MA 01970. Todisco operates as a towing company service that tows vehicles in Massachusetts.

4. Defendant **Pasquale Todisco, III** is an individual who is located is 171 Boston Street, Salem, MA 01970. He is the owner of Todisco Services Inc. As owner of Todisco, the acts of Pasquale Todisco, III are imputed to Todisco and vice versa. All of the acts of Todisco are directed by and controlled by its owner Pasquale Todisco. Therefore every allegation in this complaint alleged against Todisco is also alleged against Pasquale Todisco.

5. Defendant **Matthew Mazzarella** is an employee of Todisco, located at 171 Boston Street, Salem, MA 01970. Mr. Mazzarella made multiple false or deceptive statements to the plaintiff. As an employee of Todisco, the acts of Matthew Mazzarella are imputed to Todisco. Defendant Todisco is responsible for the conduct of its employee Matthew Mazzarella. Defendant Todisco oversees and supervises the work of its employee Matthew Mazzarella. Defendant Todisco is vicariously liable for the acts of Matthew Mazzarella under a theory of respondeat superior where an employer will be responsible for the actions of its employee taken within the scope of employment.

6. Defendant **Don "Doe"**[1] is an employee of Todisco, located at 171 Boston Street, Salem, MA 01970, who was the onsite supervisor at the East Boston location storage lot of Todisco on 2/22/19 where plaintiffs' vehicle was towed to. He made direct promises to the plaintiff that were broken or not intended to be kept. He also made deceptive statements to the plaintiff intended to trick her and to hide the damage to the vehicle until after plaintiff was forced by Don "Doe" to pay fees and sign paperwork before seeing the vehicle and to obtain the vehicle. As an employee of Todisco, the acts of Don "Doe" are imputed to Todisco. Defendant Todisco is responsible for the conduct of its employee Don "Doe". Defendant Todisco oversees and supervises the work of its employee Don "Doe". Defendant Todisco is vicariously liable for the acts of Don "Doe" under a theory of respondeat superior where an employer will be responsible for the actions of its employee taken within the scope of employment.

7. Defendant **Billy "Doe"** is an employee of Todisco, located at 171 Boston Street, Salem, MA 01970, who was the driver of the Todisco tow truck that damaged the plaintiff's vehicle on 2/22/19. He used improper towing procedures to tow plaintiff's vehicle resulting in damage to plaintiff's vehicle. As an employee of Todisco, the acts of Billy Doe are imputed to Todisco. Defendant Todisco is responsible for the conduct of its employee Billy "Doe". Defendant Todisco oversees and supervises the work of its employee Billy "Doe". Defendant Todisco is vicariously liable for the acts of Billy "Doe" under a theory of respondeat superior where an employer will be responsible for the actions of its employee taken within the scope of employment.

8. Defendant **MAPFRE** Insurance Company ("MAPFRE") is a Massachusetts domestic corporation, organized under the laws of the Commonwealth of Massachusetts, with its principal office located at 211 Main Street, Webster, MA. 01570. MAPFRE also does business as Commerce Insurance company. NB: MAPFRE acted on behalf of or in concert with and/or was used by Todisco to provide a denial of coverage letter to the plaintiff and has refused to engage in fair settlement practices in violation of Section 176D and has aided/abetted or facilitated the unfair/deceptive acts and practices of Todisco.

9. Defendant **Stephanie Wojdag** is an employee of MAPFRE, located at 211 Main Street, Webster, MA. 01570. NB: Stephanie Wojdag is the employee who effectuated a denial of coverage letter to the plaintiff and has aided/abetted or facilitated the unfair/deceptive acts and practices of MAPFRE and/or Todisco as outlined in this complaint. As an employee of MAPFRE, the acts of Stephanie Wojdag are imputed to MAPFRE. Defendant MAPFRE is responsible for the conduct of its employee Stephanie Wojdag. Defendant MAPFRE

---

[1]Plaintiffs is ignorant of these defendants' full name at this time and thus has employed the usage of the "Doe" defendant nomenclature. Plaintiffs believes they know the first names only ("Don" and "Billy") but not the last names of these defendants. The First Circuit allows plaintiffs to file complaints against unnamed defendants who cannot be reasonably identified prior to discovery. See Martinez-Rivera v. Sanchez Ramos, 498 F.3d 3, 8 (1st Cir. 2007) ("a plaintiff may bring suit against a fictitious or unnamed party where a good-faith investigation has failed to reveal the identity of the relevant defendant and there is a reasonable likelihood that discovery will provide that information.") (citing Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971)); Wilson v. Town of Mendon, 294 F.3d 1, 7 n.16 (1st Cir. 2002) (noting "the right of a plaintiff to proceed against a "John Doe" defendant whose identity can only be established through discovery. . . . [that is based on a] principle of fairness recogniz[ing] that a plaintiff . . . may not know or have the opportunity to learn the identity of the alleged wrongdoer"). NB: Virtually every state in the country allows the pleading of fictitious defendants in a complaint for unknown parties. See CCP 474; Austin v. Mass. Bonding & Ins. Co. (1961) 56 Cal.2d 596.

oversees and supervises the work of its employee Stephanie Wojdag. Defendant MAPFRE is vicariously liable for the acts of Stephanie Wojdag under a theory of respondeat superior where an employer will be responsible for the actions of its employee taken within the scope of employment.

10. Defendant **Daniel Olohan** is an employee of MAPFRE, located at 211 Main Street, Webster, MA. 01570. He is the key executive manager and secretary of MAPFRE in Massachusetts. As an employee/executive of MAPFRE, the acts of Daniel Olohan are imputed to MAPFRE. Defendant MAPFRE is responsible for the conduct of its employee Daniel Olohan. Defendant MAPFRE oversees and supervises the work of its employee Daniel Olohan. Defendant MAPFRE is vicariously liable for the acts of Daniel Olohan under a theory of respondeat superior where an employer will be responsible for the actions of its employee taken within the scope of employment.

11. Defendant **Acadia Insurance Group** ("Acadia") is a Massachusetts domestic corporation, organized under the laws of the Commonwealth of Massachusetts, with its principal office located at 290 Donald J. Lynch Blvd, Marlborough, MA 01752-4710. NB: Acadia is an insurance company that serves the Massachusetts market.

12. Defendant **JITEN Management** ("Jiten")[2], is a Massachusetts domestic corporation, organized under the laws of the Commonwealth of Massachusetts, with its principal office located at 495 Westgate Drive, Brockton, MA 02301. NB: Jiten is the principal, under which Todisco acted as an agent when Todisco committed negligence, fraud and the unfair/deceptive acts and practices outlined in this complaint. As an agent of Jiten, the acts of Todisco are imputed to Jiten. Defendant Jiten is responsible for the conduct of Todisco. Defendant Jiten oversees and supervises the work of Todisco. Defendant Jiten is vicariously liable for the acts of Todisco under a principal-agent theory of liability where a principal will be responsible for the actions of its agent.

13. Defendant **Bennett & Belfort** is a Massachusetts Professional Corporation, organized under the laws of the Commonwealth of Massachusetts, with its principal office located at 24 Thorndike St #300, Cambridge, MA02141. On information and belief, Bennett & Belfort is an agent of Todisco and assists or represents Todisco with a variety of business and legal matters. On information and belief, they are aware of or assist with the unlawful or tortious schemes and devices used by Todisco. Defendant Todisco is responsible for the conduct of Bennett & Belfort. Defendant Todisco oversees and authorizes the conduct of Bennett & Belfort Defendant Todisco is vicariously liable for the acts of Bennett & Belfort under a principal-agent theory of liability where a principal will be responsible for the actions of its agent.

14. NB: This court has both general and specific personal jurisdiction over the Defendants because the Defendants have conducted and continues to conduct substantial business in the state of Massachusetts.

### III: FACTS

#### Todisco (And Its Employees)

15. I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

16. Todisco is a tow truck company that operates in the state of Massachusetts. According to the Todisco company website, it has been in operation since 2000. Todisco's corporate headquarters is located at 171 Boston Street, Salem, MA 01970. Todisco also uses other office locations (such as 94 Condor Street, East Boston, MA 02128) where it also stores towed vehicles and processes retrieval by consumers of their towed vehicles.

17. On 2-22-19, Todisco Services Inc. ("Todisco") towed my vehicle from a hotel in Boston, using a dolly tow truck (which was wrong to do). When I went to retrieve my vehicle from Todisco, I discovered damage to my vehicle due to the towing.

18. The overseer of the tow/storage lot located at 262 Norfolk Avenue Roxbury MA 02119, at the time, was an employee named "Don", who also has the initials "DG". (i.e. Don "Doe").

19. I went to retrieve my vehicle from this Todisco's tow/storage lot (a few hours after being towed) at around or some time shortly after 5pm the same day it was towed. I was charged to retrieve my vehicle. However, upon inspection of my vehicle, I discovered damage to my rear bumper and to my muffler area. I brought this to the attention of Don, and he took photos and gave me a claim form to fill out for processing according to

---

[2] As mentioned at the 5/17/23 hearing, Jiten and the plaintiffs have been engaging in settlement negotiations including contract negotiations, and if those settlement negotiations are consummated, then Jiten may become settled out of this lawsuit upon the signing of a settlement contract and payment of settlement terms.

Todisco policy. Don told me that someone would contact me to follow-up on getting my car fixed and resolving my claim.

20. I also took pictures at that same time.

21. As further factual backdrop, it should be noted that, upon arriving at the storage lot, I approached the office area of the lot and encountered a Todisco employee named Don[3], who was the only employee attending to the office/lot that evening.

22. After I described the vehicle I came to retrieve, Don told me that I needed to pay to retrieve the vehicle. I then provided him a credit card for payment.

23. After processing the payment from my credit card, Don then printed an invoice/receipt from his computer and gave it to me to sign as a receipt and as an acknowledgement that I was legally authorized to take possession of the vehicle. The printed invoice included a detailed breakdown of the charges/fees (including surcharges and other calculations of the charges). It also showed that my credit card had been processed for payment of the retrieval fee and that there was no balance owed because of the credit card payment taken by Don.

24. There was also a place to sign my signature, just below the calculation of the numbers for the fees that I had paid. I was told that, having made the payment, I had to sign the invoice in order to retrieve my vehicle.

25. After I signaled a need for clarification, I was told that I could not retrieve my vehicle if I did not provide a signature on the invoice that he provided. He told me that signing the invoice would serve as a receipt and that he would give me a copy of it as a receipt.

26. Moreover, Don said he could not "release" the vehicle to me if I did not sign the invoice. He indicated that the invoice was also necessary to serve as a receipt that I paid the fee to retrieve the vehicle. Having tendered payment, I was given no choice but to sign the invoice, in order to retrieve my vehicle.

27. Furthermore, because Todisco held possession of my vehicle and because I took an Uber to the storage lot, I was stranded and without transportation at Todisco's lot. Todisco thus used the situation to effectively force me to sign the invoice, after having paid the fee, while leading me to believe that my signature was needed only to serve as a receipt of my payment to Todisco and to serve as written confirmation that I took possession of the vehicle. [NB: Hence, the act of demanding payment and then a signature was an act of collecting debt by Todisco.].

28. Upon being asked to sign the invoice, and after briefly looking at the invoice, I asked the Todisco employee (Don) about the fine print language at the very bottom of the page of the invoice (after the signature lines) and he told me that it did not apply to me and "not to worry about it", because by signing on the line above it, I was not waiving any rights but I was simply certifying that I was legally authorized to take possession of the vehicle as I would only be signing as "payer" indicating that I was simply paying the retrieval fee in order to take possession of the vehicle. Don also pointed to the line above the signature lines that stated that I was certifying that I was legally authorized to take possession of the vehicle.

29. Based on these representations and given the fact that Don would not release my vehicle unless I signed the invoice, I was coerced into signing the invoice, which I did as "payer" only, and wherein, according to Don, I simply certified that I was legally authorized to take possession of the vehicle and that I paid the fee to retrieve the vehicle.

30. [NB: Prior to making payment with my credit card, I was not presented with an invoice or any other document or form. At the outset, I was simply told that, in order to pick up my vehicle I needed to pay a fee. I was not asked or allowed to check or inspect my vehicle. I was not given access to my vehicle. I did not even know where on the lot my vehicle was stored (and furthermore, the lot was largely dark, muddy and dingy, and Don had to subsequently show me where my vehicle was located after I paid and signed the invoice). So, I was required to pay the fee before seeing the invoice and before seeing or being given access to my vehicle. Also, after paying the fee, I was then asked to sign the invoice as a receipt of payment. Again, this was before I saw or had a chance to inspect the vehicle].

31. I then went to retrieve my vehicle at which point I saw that there was damage to the vehicle. I showed it to Don and then he took pictures and gave me a damage claim form to fill out. He told me that the company

---

[3] NB: Don was a big, burly, gruff-looking man. The lot was located in a somewhat crappy part of town and the lot was muddy, dirty, and dingy. It was already dark, as night falls as early as 4.30pm to 5pm in the winters in Boston. It was a stressful intimidating environment to be in at night.

would take care of it and that he would send the damage claim form, along with the photos he took, to the corporate office of Todisco and that someone would contact me thereafter. NB: I was required to pay the fee and to sign the invoice before I was given access to my vehicle.

32. Here, Don acknowledged that there was damage done to the vehicle which is why he took pictures and gave me a claims form to fill out.

33. Don gave the indication that Todisco would fix the damage to my vehicle and that the company [Todisco] would follow up with me to take care of it. At no point did Don say or indicate that Todisco would not pay for the damage or was not responsible for the damage. And at no point did Don say or indicate that I had waived my claim for damage to my vehicle.

34. Furthermore, if Don understood that I had waived any claim of damage to my vehicle, Don would not have given me a damage claim form to fill out. Moreover, Don would certainly not have given me a damage claim form if there was no evidence of damage to my vehicle by Todisco. The fact that I was given a damage claim form by Don and that I filled it out and submitted it to Don, who then submitted it to Todisco's corporate office, shows that at all times (from the very beginning of this matter) Todisco knew that there was damage to my vehicle caused by Todisco and/or **that I was making a claim against Todisco for said damages**.

35. Further evidence of this admission by Todisco can also be found in email exchanges with Todisco in December 2019, regarding the admission by Todisco that it had received the claims form and photos from Don, as follows:

---

**From:** Matthew Mazzarella <mmazzarella@todiscotowing.com>
**Sent:** Friday, December 27, 2019 10:18 PM
**To:** Liberty _6 <liberty_6@msn.com>
**Cc:** matty@todiscotowing.com <matty@todiscotowing.com>
**Subject:** Re: Outstanding Claim
Evening,
I did check with Don and he said he did take photos in the area you claimed damage. However his photos are not of the best quality and it was dark out. So in order to help you more efficiently can you please send me photos of the damage you are claiming happened or bring your vehicle by our main office in East Boston Monday-Friday so we can have our claim adjuster look at your vehicle for you. Thanks,
Matt Mazzarella

---

On Fri, Dec 27, 2019 at 5:27 PM Liberty _6 liberty_6@msn.com wrote:
Matthew:
The claim form describes the damage. There is a deep gash and scraping that caused piercing/denting to the rear bumper and muffler area. **"Don"** at the Roxbury office said he would pass on the photo(s) that he took along with the claim form. Can you please check with Don? Presumably, Don probably still has it on his phone/camera. If for some reason, the photo is not in anyone's files, then please let me know. Either way, please let me know the next steps to get this resolved. Thank you,
Natalie Anderson
Phone: 617.710.7093

36. No one contacted me from Todisco since February 22, 2019. I patiently waited for a long time, but no one followed up with me. I then contacted Todisco several times to follow-up on my own but to no avail.

37. Finally, after several attempts to follow-up, I was given the name/email of a person named "Matty" who (I was told) was supposed to be the person that should have followed up with me regarding the damage to my vehicle pursuant to the claims form that I filled out and submitted to Don back in 2/22/19. I was eventually put in contact with Matthew Mazzarella, who was purported to be the person who handles these claims.

38. After I sent an email to Matty at Todisco, a long back and forth then occurred by email with Mr. Mazzarella over several days, weeks and even months.

39. Mr. Mazzarella/Todisco eventually told me that Todisco refused to pay for the costs to replace or to fully repair my rear bumper because of purported "prior dings and dents all over my rear bumper". Mr. Mazzarella also stated that he had photos of my vehicle prior to towing, which purportedly showed this prior damage.

40. I denied that there was prior damage and asked Mr. Mazzarella to show me proof by sending me these purported photos of this prior damage. He refused to send the photos to me, which indicated to me that there were no such photos that showed prior damage. On information and belief, Mr. Mazzarella thus fabricated this assertion, in order to intimidate me and prevent me from obtaining a proper damage estimate and to

undermine the claims process. This was an unfair and deceptive practice. Moreover, I have my own photos that prove that there was no prior damage to the rear bumper of my vehicle.

41. The email exchange below shows proof of the bad faith misrepresentations by Todisco as it pertains to the purported photos of prior damage and Todisco's refusal to show me the photos of said purported prior damage, as follows:

*Email Exchange*

**From:** Liberty _6 <liberty_6@msn.com>
**Sent:** Tuesday, February 11, 2020 2:52 PM
**To:** Matthew Mazzarella <mmazzarella@todiscotowing.com>
**Cc:** matty@todiscotowing.com <matty@todiscotowing.com>
**Subject:** Re: Outstanding Claim

Matthew,

Just to be clear, you never asked for an estimate (you only offered to fix the car in your shop). I was the one who suggested getting an estimate, not you. And I never refused to get an estimate. Why are you making these statements or insinuations? It is only making things worse as it comes across like you are trying to play games. I have been emailing you back and forth since last night and today. I cannot get an estimate while I am emailing you about this. I said I will get one as soon as I can. So, you do not need to ask again for an estimate because I said I will get one as I originally offered since last night (and I have to make an appointment to get an estimate as I cannot snap my fingers to get one).

I wanted my car independently repaired because I want an independent objective third party to estimate the damage and fix the vehicle. Also, I do not trust your repair shops (especially since you are a towing company and not a repair shop). I also do not trust whether you will try to play games with properly repairing my vehicle or falsely creating further damage in order to claim prior damage. Your bad faith statements thus far seem to confirm my concerns. Either way, I am entitled to an independent estimate and an independent repair. You cannot try to use that against me because I want an independent objective third party to estimate the damage and fix the vehicle.

Moreover, you are acting as though you do not understand that the issue, created by your false statements, with obtaining any estimate is that you claim there is prior damage that would affect how the car is repaired. Because you made this statement and said you have photos of said prior damage, then that required me to ask to see your photos, which is only reasonable. You certainly could not expect me or anyone to simply take your word for it, without seeing the photos you say you have. Moreover, your refusal to show me the photos, raises questions about the truth of your statement. If you had it, why not show it to me to simply put an end to this? The only reason you could have for not showing it to me is because you know you are not telling the truth. NB: I know you are not telling truth because I know my own vehicle and I know there was no damage at all to my rear bumper until you towed it. In fact, I just went outside and looked at the rear bumper again, and there is no damage to the rear bumper other than that which was caused by your tow truck.

Additionally, there is no confidentiality recognized by law that requires you to keep from me the photo you took of my vehicle, especially where I have requested it because you assert there was prior damage. Similarly, you had no problem showing me the photos of other people's cars being towed. So why all of a sudden do you have a problem sending me photos of my own vehicle. This simply makes no sense. I truly do not understand why you have taken the position you have taken, unless you know you made false statements and realize that you spoke too soon or was caught making a false statement.

-Natalie

**From:** Matthew Mazzarella <mmazzarella@todiscotowing.com>
**Sent:** Tuesday, February 11, 2020 2:06 PM
**To:** Liberty _6 <liberty_6@msn.com>
**Cc:** matty@todiscotowing.com <matty@todiscotowing.com>
**Subject:** Re: Outstanding Claim

Yes I can see how you are frustrated. We offered to repair your vehicle back to factory condition in a state certified body shop to which you refused and then have asked multiple times for an estimate so we can go the next step to get this resolved. Please provide estimate when available. You will hear from me again once received. Thanks,
Matt Mazzarella

On Tue, Feb 11, 2020 at 1:58 PM Liberty _6 <liberty_6@msn.com> wrote:

Matthew,
As I previously stated, I will provide an estimate for damage repair as soon as I can. Ideally, I would like a cordial resolution and for my vehicle to be properly repaired/fixed without consternation or rancor. However, in light of some of your previous statements, if this matter is not handled properly here on out, or if bad faith attempts are made to unfairly undercut my claim, then I will reserve my right to take the necessary steps to seek relief as necessary. The record here speaks for itself in regards to what you have said and what you have refused to do. I will wait to see what transpires hereafter.
-Natalie

**From:** Matthew Mazzarella <mmazzarella@todiscotowing.com>
**Sent:** Tuesday, February 11, 2020 1:33 PM
**To:** Liberty _6 <liberty_6@msn.com>
**Cc:** matty@todiscotowing.com <matty@todiscotowing.com>
**Subject:** Re: Outstanding Claim

Please provide an estimate for the repair of damage on your vehicle. We are making every effort here to try and get this settled for you. No I do not retract any statement and no we will not share the photos that we have. I again am asking for a cost to repair estimate on the damage you claim happened during your vehicle being towed. If you can not provide us with this I do not know how we can help you.
Matt Mazzarella

On Tue, Feb 11, 2020 at 1:28 PM Liberty _6 <liberty_6@msn.com> wrote:

Matthew,
What do you mean by "presume what you wish"? Are you saying that you are not retracting your previous statements about prior dings and dents to my rear bumper?
If so, your company has a problem. You have made false or bad faith statements in what appears to be an attempt to affect the claims process and repair estimate process. You stated that there was prior damage. This is a big deal if not true (which it is not true). It is also an unfair and deceptive practice, and a violation of my consumer protection rights.
I tried to give you a way out or to save face, in light of such false statements, by saying to you that if you don't provide the photos then I will presume that you no longer intend to assert that there was prior damage. If, however, you still intend to assert that there was prior damage, then I need to see the photos. Pure and simple. This is not an unreasonable position for me to take, especially in light of the fact that you were the one that raised this issue.
Hence, I need you to state clearly whether (or not) you still intend to assert prior damage as a basis to affect the proper estimate of repair of my vehicle. Can you please give me a straight answer on this (as this is already eating up a lot of my time).
-Natalie

**From:** Matthew Mazzarella <mmazzarella@todiscotowing.com>
**Sent:** Tuesday, February 11, 2020 1:06 PM
**To:** Liberty _6 <liberty_6@msn.com>
**Cc:** matty@todiscotowing.com <matty@todiscotowing.com>
**Subject:** Re: Outstanding Claim

Presume what you wish. After please provide an estimate. Thanks,
Matt Mazzarella

On Tue, Feb 11, 2020 at 12:58 PM Liberty _6 <liberty_6@msn.com> wrote:

Matthew,
I do not understand why, in this case, you are refusing to provide the photos you said you have of my own vehicle (which you said were taken prior to towing and showed prior dings or dents on the rear bumper, etc). This purportedly would be a photo of my vehicle, not someone else's vehicle. Hence, this should not be some kind of confidential information that you should keep from me. And since you were comfortable sending me photos of other vehicles in your last email, then why can't you send me the pics of my own vehicle.
Moreover, your purported assertion about prior dings or dents on my rear bumper is relevant to the issue of my obtaining a proper estimate for repair. It is thus important for me to see the photos of my vehicle that you say you have (prior to towing), so that this issue/question can be resolved once and for all.
If you persist in not providing me the photos you say you have, then I will have to presume that you have retracted your statement about "prior dings or dents", etc., and I can then proceed accordingly, without further need to address this issue/question previously raised by you.
Based on the foregoing, unless I hear otherwise, I will thus move forward with getting an estimate for you as soon as I can, in accordance with the above presumption.
-Natalie

**From:** Matthew Mazzarella <mmazzarella@todiscotowing.com>
**Sent:** Tuesday, February 11, 2020 12:28 PM
**To:** Liberty _6 <liberty_6@msn.com>
**Cc:** matty@todiscotowing.com <matty@todiscotowing.com>
**Subject:** Re: Outstanding Claim

Afternoon,
It has nothing to do with much of anything why you were towed at this point I was just making sure 1) I was referencing the correct vehicle and 2) you sounded like you thought the pictures I was talking about having were from Don. We take pictures on most all of our tows to prevent from fraudulent claims against us. We also do not share photos with customers. You are also correct about damages if we cause damage we want to make sure it is taken care of any way possible

because we do care about our customers vehicle regardless of why they were towed. Please provide us with an estimate for repair so we can move forward. I also included some photos so you can see what we mean when we say dolly truck.
Matt Mazzarella

42. I then obtained two damage estimates from two different repair shops. In addition, there is the harm for loss of use of my vehicle while it is repaired (costing additional money to rent a car while my vehicle is being repaired). The type of repairs described in the estimate take about two weeks to complete inspection/diagnostics and all repairs, including disassembly and reassembly of parts, painting/blending, cleaning, and administrative processing, etc. The cost per day including rental fee, insurance, taxes and fees, the minimum costs that needs to be covered for loss of use/rental car use is significant. NB: See *Antokol v. Barber, 143 N.E. 350, 352 (Mass. 1924)* ("The loss of use of the automobile during the period of repair is as much the natural and necessary consequence of the tortious act of the defendant described in the declaration as is the cost of the repair. It is as plainly as is the loss of time of an individual arising from personal injuries, or the loss of use of any chattel arising from wrongful act… the fair value of the loss of use of the plaintiff's automobile while being repaired was the hire paid for the one to take its place".). See also *Urico v. Parnell Oil Co., 552 F. Supp. 499 (D. Mass. 1982), aff'd, 708 F.2d 852 (1st Cir. 1983)* (applying Massachusetts law) ("A plaintiff may be entitled to loss of use damages extending beyond the time actually necessary to make repairs, depending on the reasonableness of his efforts to minimize his damages. This, in turn, depends on a number of factual circumstances, including the financial situation of the plaintiff, the cause of the plaintiff's inability to minimize his loss, the role played by the defendant in contributing to the difficulty in which the plaintiff finds himself at the time mitigation would be required, and the relative ability of both parties to prevent the aggravated loss."). See also *Longo v. Monast, 40 A.2d 433 (R.I. 1944)* (A plaintiff's loss of use of his vehicle is an element of damage for the jury to consider). See also *Petroleum Heat & Power Co. v. United Elec. Rys. Co., 150 A. 259 (R.I. 1930)* (A plaintiff's testimony as to what he paid per day for use of a replacement vehicle is admissible as prima facie proof of damages for loss of use of a vehicle. Longo v. Monast, supra.). See also *Scott v. S. Ry. Co., 97 S.E.2d 73 (R.I. 1957)* (Loss of use is recoverable even when a rental vehicle is supplied for free by a third party). See also *Copadis v. Haymond, 47 A.2d 120, 122 (N.H. 1946)* (Loss of use is measured by the cost of a rental vehicle during the reasonable time required for repairs.).

43. There are additional costs that will be involved once the vehicle repairs begin. This includes damage to the front end of the vehicle and undercarriage of the vehicle, etc., which was identified shortly after the towing incident.

44. NB: Shortly after this incident, my vehicle was diagnosed with front-end/car alignment difficulties and damage to the undercarriage shaft of the vehicle. This diagnosis, that occurred shortly after the towing incident, included identification of front-end problems/alignment difficulties by a dealership[ service department where I was getting my car inspection sticker renewal done. There was also indication of damage to the undercarriage of the vehicle. I eventually obtained two repair estimates from two different independent body shops. These two estimates only related to the obvious/visible damage to the rear area of the vehicle.

45. But Todisco claimed that the estimates were confusing and that they were referring the matter to their insurance company for processing.

46. As a result of the email correspondence with Mr. Mazzarella, it became abundantly clear that I was intentionally being treated unfairly.

47. As a result of Todisco's bad faith refusal to pay for the damage, this refusal had resulted in several months of further delay on top of the delay of a year since I filed the original damage claim form with Todisco, and resulted in extensive additional amount of time, energy and resources expended to try to resolve this matter but to no avail.

48. Although the defendants initially promised to fix my vehicle, they've not done so to this day, while engaging in extensive dilatory and unfair/deceptive acts including but not limited to making false statements / misrepresentations to avoid paying the claim as well as sending my claim to an insurance company that Todisco didn't have a policy with, to cover such damage claims. I sent Todisco more than one 93A demand letter (with repair shop estimate included) but Todisco either failed to provide a reasonable offer of settlement and/or reneged on or withdrew from settlement discussions in bad faith, without providing any payment for damages. Todisco has a pattern of said unfair/deceptive acts with others.

49. NB: As will be further explained later in this document, Todisco has engaged in a predatory fraudulent scheme to deny consumers payment for damage to their vehicles caused by Todisco. On information and belief, this constitutes a pattern and practice, forming part of a racket by Todisco designed to defraud and scam the public via these unfair and deceptive practices. See **Exhibit 2 – Complaints from Other Consumers (on BBB and Yelp) Showing That They Were Subjected to The Same or Similar Tactics by Todisco.**

50. Todisco further misrepresented that it would cause its insurance company (MAPFRE Insurance/Commerce Insurance) to process my claim, thereby giving me the misleading impression that it had a policy with said insurance company that covered my claim (i.e., under a garage-liability policy) when in fact it did not.

51. Hence, Todisco intentionally misrepresented the nature of its relationship with MAPFRE/Commerce insurance in order to further frustrate, delay and ultimately get out of paying my damage claim. By doing so, Todisco engaged in deceptive conduct and violated 93A.

52. Similarly, by proposing a resolution to my claim that was misleading, disingenuous, and futile because it had no applicable policy with MAPFRE/Commerce, Todisco violated Chapter 93A. This proposal or course of action by Todisco was knowingly "doomed to fail", and thus was in violation of Chapter 93A.

53. These things constitute unfair or deceptive acts or practices, in my opinion, and are unlawful as declared by Section 2 of Chapter 93A.

54. Todisco knowingly caused me emotional distress by making false statements about prior damage to my vehicle and by delaying the resolution of my claim.

55. Todisco had no intention to refer my claim for processing and coverage under a garage/garage-keepers liability insurance policy. Todisco intended to have MAPFRE/Commerce generate a denial, with the intent that this would dissuade me from further pursuing the claim.

56. Todisco evidently has handled my claim in an arbitrary, capricious, and bizarre manner, which not only indicates unfair and deceptive acts but also intent to inflict emotional distress. Todisco's marked hostility and antagonism also indicates an intent to treat me in a subpar, disrespectful, dismissive, and disparate manner.

57. Also, by failing to conduct a reasonable investigation, by failing to effectuate a prompt, fair and equitable settlement in which liability had become reasonably clear, and by pursuing unreasonable arguments to defend against my reasonable demand and by refusing to settle in good faith thus forcing me to prepare to file a lawsuit, Todisco has further engaged in willful unfair and deceptive acts. See Anderson v. National Union Fire Ins. Co., SJC-12108, 2017 WL 445244, at *1 (Mass. Feb. 2, 2017) (where judge "concluded that these violations were willful and egregious, warranting an award of punitive damages under Chapter 93A, §9(3). Accordingly, he awarded the plaintiffs treble damages…").

58. Todisco refused, in bad faith, to offer or provide prompt resolution of this matter.

59. As a result of the unfair and deceptive acts or practices alleged herein, I sustained injury.

60. In consequence of Todisco' unfair and deceptive acts, I suffered and will continue to suffer damages including, but not limited to, financial and other losses, pain and suffering, and emotional distress.

61. Todisco acted intentionally, willfully, and with reckless disregard for my rights.

62. Todisco's actions, statements and omissions alleged herein were committed willfully and knowingly.

63. Moreover, I sent more than one written communication to Todisco describing, in one form or other, the damages and unfair acts or practices described above, and the injuries suffered as well as demanding relief or that action is taken to remedy the situation by Todisco.

64. Instead, Todisco told me that it would all of a sudden not handle paying my claim but that it would now (for the first time after a year had passed since I filed my claim with Todisco on February 22, 2019) forward my claim to its insurance company. However, Todisco's insurance company (MAPFRE/Commerce Insurance) denied my claim on the grounds that Todisco did not have any applicable policy with it. Evidently, Todisco did not purchase/obtain the required garage/garage keepers' liability insurance from MAPFRE/Commerce, as required by the state of Massachusetts. See **Exhibit 1 – Denial email by MAPFRE from Stephanie Wojdag.**

65. This refusal to grant relief was done in bad faith with knowledge or reason to know that these acts violated Massachusetts Laws. Similarly, this referral of my claim to MAPFRE/Commerce Insurance company for processing (when Todisco knew that it had no policy with MAPFRE) was done in bad faith, and was done to dissuade me from persisting with getting my vehicle damage repaired and to frustrate me by further delay and by a drawn-out circuitous process.

66. Todisco's refusal to grant relief upon demand was done in bad faith with knowledge or reason to know that the acts and practices complained of violated Chapter 93A.

67. The acts of Todisco were willful and knowing acts in violation of G.L. c. 93A.

68. The failure of Todisco to make a reasonable offer of settlement is a willful & knowing violation of G.L. c. 93A.

69. Eventually, having exhausted all attempts to reason with and negotiate with Todisco (including escalating the matter to owner Pat Todisco who has not responded in kind), I submitted/served a demand letter for relief under G.L. c. 93A to Todisco on or about February 20, 2020, which clearly outlined the facts, my causes of action and my damages.

70. Todisco nevertheless has refused to offer any reasonable settlement of this claim. In bad faith, Todisco made several false statements in its 93A response of 3-10-20, and completely fabricated certain factual assertions made by it, and claimed that it did not damage my vehicle, and that it did not owe me any compensation.

71. Despite being provided with a detailed written demand for settlement, and a written demand for relief pursuant to M.G.L. c. 93A, and despite my initial claims submitted to Todisco in February 2019 and also despite then further attempts to follow-up thereafter but to no avail until December 2019, and then finally despite other numerous email correspondences with Todisco, starting in December 2019 through February 2020, still yet Todisco has refused to make a reasonable and good faith offer to settle the claim, forcing legal action.

72. The ongoing unfair and deceptive acts and practices of Todisco have the result of forcing me to file suit, as Todisco refuses to tender any reasonable settlement offer.

73. I am entitled to an award of up to treble damages, in connection with this claim, pursuant to Massachusetts General Laws 93A.

74. Hence, Todisco has again engaged in misrepresentation, false statements, misleading statements about the law in order to deceive me, a pro se party, and to engage in flat out deceptive conduct designed to further harm, injure me and deprive me of my rights as a consumer.

75. Several state and federal fraud statutes make it a crime to engage in a "scheme or artifice to defraud," so proving deceptive conduct can be the basis for a RICO lawsuit, including in many cases, being misled in ways involving mail or wire communications, such as emails or bank transactions, that formed a pattern of racketeering activity.

76. In my case, Pat Todisco, Matthew Mazzarella and Don, along with others, have contrived a scheme to defraud me, and the public, by engaging in a pattern of illegal conduct and racketeering activity. This includes activity designed to delay, frustrate, extort, and mislead consumers towed by Todisco in order to prevent, hinder and avoid payment of damages to vehicles caused by Todisco and its employees and agents. This activity also included predicate illegal acts such as mail and wire fraud using email and the internet to perpetrate its fraudulent and deceptive activity.

77. Similarly, the MAPFRE/Commerce insurance company is being used by Todisco as part of its scheme to deny consumers coverage of payment for vehicle damage. Todisco sends claims to MAPFRE who then denies these claims because it has no applicable policy to cover said claims.

78. On information and belief, many consumers are not sophisticated enough to realize said scheme or to fight back with the necessary legal action in court, and thus they are defrauded and deprived of their rights by Todisco.

79. Todisco's lawyers have consistently represented Todisco in legal matters in court, and it is not likely that they are completely ignorant of these schemes and devices used by Todisco. The fact that Todisco's lawyers have taken to write a reply to my 93A demand which included blatant falsehoods, misleading statements, outright lies and assertions of a fabricated or twisted record of the facts, shows that Todisco's lawyers are complicit in this fraudulent enterprise of illegal and unconscionable activity.

80. Based on all of the foregoing, Todisco and MAPFRE are engaged in a predatory fraudulent scheme to deny consumers payment for damage to their vehicles caused by Todisco. Evidently, this constitutes a pattern and practice, forming part of a racket by Todisco and MAPFRE designed to defraud and scam the public via these unfair and deceptive practices.

## MAPFRE (And Its Employees)

81. I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

82. MAPFRE is a major insurance provider that serves the Massachusetts market, among others throughout the USA as well as internationally.

83. There is a state requirement that Todisco has to have a policy to cover damage it causes to vehicles that are towed (i.e., a garaging liability policy). Thus, Todisco must have a garaging liability policy.

84. Todisco reported the damage to plaintiff's vehicle to MAPFRE. MAPFRE denied the claim stating that Todisco did not have the proper insurance with MAPFRE to cover the claim. **Exhibit 1 – Denial email by MAPFRE from Stephanie Wojdag.**

85. MAPFRE stated that Todisco has an auto business policy with MAPFRE but that this policy does not cover the claim of damage to plaintiff's vehicle. The plaintiffs do not know if this is true or not.

86. When plaintiffs asked to see the policy, it was denied by MAPFRE. MAPFRE was thus not forthcoming or transparent with respect to the policy that Todisco had with it and sought to hide this policy from the plaintiff in blocking her request for the policy. Only discovery will reveal this policy at this juncture. Should this policy reveal that Todisco's damage to the plaintiff's vehicle was covered by this policy, then it would further support a claim against MAPFRE. Because MAPFRE is in possession of this information, and refuses to provide it to the plaintiff, it can be inferred that there is damaging information in the policy that would undermine MAPFRE's denial of coverage.

87. That MAPFRE is culpable for such wrongdoing is evidenced by the fact that Todisco sent the claim to MAPFRE.

88. This is prima facie evidence that MAPFRE is the correct provider of insurance coverage for plaintiff's claim.

89. Similarly, if MAPFRE was the wrong insurance provider, then it stands to reason that either MAPFRE or Todisco, would forward the claim to the correct insurance provider.

90. Because the plaintiffs has not been contacted by any other insurance provider, then it can be inferred that MAPFRE is the correct insurance provider for plaintiff's claim. This factual inference goes to establishing that MAPFRE has violated section 176D and chapter 93A.

91. NB: If Todisco did not notify the correct insurance provider of the claim, when it knew that MAPFRE was not the correct insurance provider, then Todisco was further engaged in unfair & deceptive practices and acts.

92. If Todisco knew that MAPFRE was not the correct insurance provider but still forwarded to claim to MAPFRE only to be denied, then Todisco was engaged in unfair and deceptive acts.

93. If MAPFRE has received claims for garaging liability from Todisco in the past, but did not investigate why Todisco kept doing that or did not advise Todisco to purchase the correct insurance coverage from MAPFRE or did not advise Todisco to refer the claim to the correct insurer, then MAPFRE was engaged in a scheme to aid and abet Todisco in denying payment of vehicle damage claims to the public, and/or was engaged in a scheme to get out of paying claims for vehicles damaged by Todisco.

94. If MAPFRE knew that Todisco had a practice of sending consumer vehicle damage claims to MAPFRE and did not put a stop to that but kept sending denial of claim coverage letters to consumers, then MAPFRE was engaged in unfair and deceptive practices.

95. Why would MAPFRE even get involved with sending any communication with the consumer if MAPFRE was the wrong insurance provider? Logically, if MAPFRE was the wrong insurance provider, and it received a consumer vehicle damage claim from Todisco that MAPFRE did not cover under Todisco's policy with MAPFRE, then MAPFRE should have simply sent the claim back to Todisco, advising Todisco that MAPFRE cannot process that claim because Todisco did not have coverage for the claim under Todisco's auto business policy with MAPFRE. Why would MAPFRE even process the claim and deny it and send that denial to the consumer directly? This is an unfair and deceptive act. Many consumers who are not sophisticated would be fooled by such a denial letter, and this would cause a certain percentage of the public to simply not pursue the claim further. But if Todisco did not have the correct or proper insurance with MAPFRE to cover the claim, then why would MAPFRE communicate with/send a letter to me as the consumer about the claim? And why would MAPFRE tell me that the claim was "denied", when the claim simply could not be processed under the policy, assuming arguendo its representations about the policy was correct? Something is terribly fishy or suspect about this whole ordeal. MAPFRE either way behaved in a way that aided and abetted Todisco's wrongful referral of the claim to MAPFRE and aided and abetted Todisco is trying to avoid its obligation to pay for the claim promptly under its garaging liability policy required by law. MAPFRE's conduct gave Todisco cover to effectuate, perpetuate and continue its scheme of delaying, denying, obfuscating its obligation to pay for the damage to my vehicle. This is unfair and deceptive conduct by MAPFRE.

96. NB: Todisco has not stated or confirmed that MAPFRE is not the correct insurance provider.

97. In all of the above plausible scenarios, MAPFRE was engaged in wrongdoing that was unfair and/or deceptive or otherwise was engaged in aiding and abetting Todisco in unfair and/or deceptive practices.

98. To add insult to injury, the plaintiff sent 93A demand letter to MAPFRE, including to its key executive leader in Massachusetts (and secretary) Daniel Olohan describing, in one form or other, the damages and unfair acts or practices described above, and the injuries suffered as well as demanding relief or that action is taken to remedy the situation but to no avail. The 93A demand letter was rejected and no offer of any settlement was ever made by MAPFRE or Mr. Olohan.

99. NB: On information and belief, Daniel Olohan as the key executive manager and leader of MAPFRE in Massachusetts who oversees all of MAPFRE business operations in Massachusetts, is aware of and is complicit with the acts of Todisco outlined in this complaint. Therefore, the acts of Stephanie Wojdag outlined in this complaint are also imputed to Daniel Olohan or at least imputed to Daniel Olohan's knowledge. On information and belief, Daniel Olohan is therefore a key player in the fraudulent enterprise of Todisco in Massachusetts. On information and belief, Todisco could not do and continue to do what it has done for several years in using MAPFRE as part of its illegal enterprise fraudulent activity and racketeering activity, without the knowledge and/or blessing of Daniel Olohan in Massachusetts. Daniel Olohan and MAPFRE must have conducted due diligence, as an insurance company, on Todisco and its operations, as well as how Todisco does business and Todisco's risks of claim exposure. It would be hard to believe if Daniel Olohan and MAPFRE claim that they did not know. Discovery will reveal more about this. The plaintiffs believe that discovery will furnish evidence of the above.

100. Based on all of the foregoing, Todisco and MAPFRE have engaged in a predatory fraudulent scheme to deny consumers payment for damage to their vehicles caused by Todisco. Evidently, this constitutes a pattern and practice, forming part of a racket by Todisco and MAPFRE designed to defraud and scam the public via these unfair and deceptive practices.

### Acadia Insurance Group

101. I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

102. Acadia is a major insurance provider that serves the Massachusetts market.

103. On information and belief, Acadia is another one of the insurance providers for Todisco.

104. On information and belief, Todisco has more than one type of insurance policies with Acadia.

105. On information and belief, it is possible that Todisco's insurance policies with Acadia has broad coverage to include damage to consumers vehicles caused by Todisco. NB: Discovery will reveal whether this is the case.

106. On information and belief, if MAPFRE was not the correct insurance provider, then Acadia was likely the correct insurance provider, and it is also possible that Acadia was notified by Todisco of the claim for vehicle damage involving the plaintiff's vehicle. NB: Discovery will reveal whether this is the case.

107. Because Acadia is an insurer for Todisco, then if it was notified of the claim by Todisco, then Acadia should have addressed or resolved the claim.

108. NB: If Todisco did not notify the correct insurance provider of the claim, when it knew that MAPFRE was not the correct insurance provider, then Todisco was further engaged in unfair and deceptive acts.

109. If Todisco knew that Acadia was the correct insurance provider but still forwarded to claim to MAPFRE only to be denied, then Todisco was engaged in unfair and deceptive acts.

110. If Acadia was aware that Todisco was sending it garaging liability claims to MAPFRE, but did not investigate why Todisco kept doing that or did not advise Todisco to not do that/stop doing that, then Acadia was engaged in a scheme to get out of paying claims for vehicles damaged by Todisco, and/or Acadia was engaged in a scheme to aid and abet Todisco in denying payment of vehicle damage claims to the public.

111. If Acadia knew that Todisco had a practice of sending damage claims to MAPFRE and did not put a stop to that, then Acadia was engaged in unfair and deceptive practices.

112. On information and belief, if Acadia knew of the damage claim to plaintiffs' vehicle but sat on its hands and did nothing, allowing Todisco to skirt its obligation to pay for damage to consumer's vehicles caused by Todisco, then Acadia was engaged in unfair and deceptive practices.

113. In all of the above plausible scenarios, Acadia was likely to have been engaged in wrongdoing that was unfair and/or deceptive or otherwise was engaged in aiding and abetting Todisco in unfair and/or deceptive practices.

114.   On information and belief, the defendants are operating a racket designed to defraud members of the public.

115.   NB: Discovery will reveal more about the above. The plaintiffs believe that discovery will furnish evidence of the above.

### Jiten Management

116.   I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

117.   Jiten had a duty to ensure that Todisco had proper/required insurance for their work (which evidently Todisco did not at the time). Jiten is responsible for this. Jiten either knew or did not know about this issue with Todisco, but either way Jiten is responsible for knowing.

118.   Jiten has a duty to do due diligence on Todisco, not only as it relates to proper/requires insurance, but also to look into whether Todisco had a pattern of misconduct in damaging vehicles towed and failing/refusing to pay for such damage or engaging in unfair and deceptive practices to string customers along to avoid payment. Jiten either knew or did not know about this issue with Todisco, but either way Jiten is responsible for knowing.

119.   Jiten as principal was negligent in its selection of Todisco as a provider of Tow services for Jiten.

120.   NB: It should be noted that the events occurred on the premises of Jiten, which heightens Jiten's responsibility to oversee or supervise the work and conduct of Todisco.

121.   Moreover, the hotel should not have called Todisco in the first place to effectuate the towing of plaintiff's vehicle by Todisco. The plaintiffs were given permission to park in the spot by the front desk on the night of a bad snowstorm (where other spots were full). [NB: Jiten owned the property from which the vehicle was towed and thus since Jiten called the tow company because it is their property, then the plaintiffs were injured by the acts of Jiten and thus the plaintiffs have a valid claim against Jiten]. Furthermore, the hotel should have at least contacted the plaintiffs, first, as platinum loyalty rewards members of the hotel, before calling to tow by Todisco. Jiten is responsible for the employee who gave permission to park in the spot near the front of the hotel. It is unfair and deceptive for Jiten employees to give permission to park in a spot and then turn around and call towing company to tow vehicle from that spot. If there was some miscommunication or lack of communication between the night shift employee and the day shift employee that resulted in the calling of the tow company, then Jiten is still responsible for that.

122.   Jiten's direct actions led to the plaintiffs, suffering injury and damages.

123.   Jiten's failure to oversee the Todisco led to the plaintiffs, suffering injury and damages.

124.   Jiten's negligence and failure to conduct proper due diligence on Todisco as a towing company led to the plaintiffs suffering injury and damages.

125.   Jiten's actions and inactions caused plaintiffs to sustain harm.

### Bennett & Belfort

126.   Bennett & Belfort is an agent of Todisco and assists or represents Todisco with a variety of business and legal matters. On information and belief, Bennett and Belfort provides business and legal recommendations to Todisco on the conduct and operations of Todisco's businesses.

127.   Bennett & Belfort are thus aware of or assist with the unlawful or tortious schemes and devices used by Todisco to defraud consumers.

128.   On information and belief, rather than prevent Todisco from engaging in such acts, Bennett and Belfort aids and abets such acts, enables, and assists such acts and further empowers and encourages Todisco in continuing such acts.

129.   On information and belief, Bennett & Belfort is also a co-conspirator with Todisco, making them complicit in the fraudulent enterprise of illegal and unconscionable racketeering activities of Todisco.

130.   Bennett & Belfort are thus part of a fraudulent enterprise of illegal and unconscionable racketeering activities of Todisco.

131.   In addition to the above, starting in around 2020 and continuing into 2021 (from during the time of the pandemic over a period spanning about two years), Bennett and Belfort have also engaged in bad faith conduct in dealing with me.

132.   Bennett and Belfort have also delayed and dragged out their response to my several written communications, refusing to answer or respond for extended periods of time, resulting in extreme delay and harm to the plaintiffs.

133. Bennett and Belfort's acts of refusing to respond to me for several months, on more than one occasion, was calculated to harm me and to frustrate me so that I would give up on seeking payment for the damage to my vehicle.

134. Bennett and Belfort have also breached their duty to be fair with me, under the rules of ethics, as a party seeking payment of damages from Todisco. NB: Violations of the rules of ethics can be per se 93A violations.

135. These acts by Bennett and Belfort were designed and calculated to injure me and to defraud me. These acts by Bennett and Belfort were designed to aid and abet Todisco's unlawful activities and racketeering activities and to help cover for such activities, in order to assist Todisco in continuing to perpetuate these activities on members of the public.

136. The above acts show that Bennett and Belfort are complicit in this fraudulent enterprise of illegal and unconscionable racketeering activity. Bennett & Belfort are not shielded from liability when they are complicit in criminal or unlawful activity, or when they participate in it or provide cover for it.

137. On information and belief, discovery will show that Bennett and Belfort are closely involved with and are intimately aware of, and have covered up, provided cover for, or have participated in the unlawful, illegal, and racketeering activities of Todisco.

## IV. COUNTS/CLAIMS

### COUNT 1 - NEGLIGENCE CLAIM

**(Todisco Services Inc., Pasquale Todisco, Matthew Mazzarella, Billy Doe, Don Doe, Jiten Management)**

138. I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

139. Vehicle damage that results from towing falls under the personal injury claims umbrella. Personal injury claims operate under negligence law, which is based on the fact that improper, or negligent towing practices caused property damage.

140. At all relevant times including on February 22, 2019, Todisco was the owner of the tow truck being operated by a Todisco Tow Truck driver named "Billy" who was/is an employee of Todisco (i.e. Billy "Doe").

141. Todisco's vehicle was operated in an unsafe or uncareful or negligent manner when it damaged my vehicle including but not limited to the rear-end bumper and muffler area of my vehicle. After the damage was discovered at Todisco's tow/storage vehicle lot in Roxbury, a Todisco's employee took pictures of the damage and agreed to process a claims form for damages to my vehicle along with the pictures of the damage attached to the claims form.

142. Todisco owns the tow trucks that it operates, and the tow truck used to tow my vehicle on February 22, 2019 is registered to Todisco as the owner.

143. Todisco is responsible for the acts of Todisco's tow truck drivers as employees of Todisco. NB: An employer is liable for the negligent acts of its employee, as a matter of law.

144. Todisco is required by Massachusetts law to carry insurance for this very purpose i.e. to cover claims for damage to vehicle caused by tow company during a tow or while stored at the tow company lot.

145. NB: Most states[4], including Massachusetts[5], require that tow companies are liable for damage to a consumer's vehicle if that vehicle is damaged while being towed or while being stored by the tow company. This includes unintentional damage where the vehicle was damaged simply as part of the act or process of towing. This requirement imposes a duty of care on tow companies.

146. A tow-truck driver has to take all reasonable precautions to prevent a consumer's vehicle from being damaged and to prevent anything being lost from it.

147. A towing company, including the driver, owes a duty to provide their services without damage or injury.

---

[4] NB: See California (V C Section 22651.07): "*Generally the owner of a vehicle may recover for any damage to the vehicle resulting from any intentional or negligent act of a person causing the removal of, or removing, the vehicle.*" See also Texas (Texas Transportation Code - Section 684.084): "(a) *A towing company or parking facility owner who violates this chapter is liable to the owner or operator of the vehicle that is the subject of the violation for: (1) damages arising from the removal or storage of the vehicle*".

[5] According to M.G.L. c. 159B, §6B, "Nothing contained in this section shall in any way affect the liability of said motor vehicle storage facilities".

148.     Todisco owed a duty of care to me to ensure that the vehicle owned by Todisco and operated by Todisco employees was being operated in a safe and careful manner and without damage to my vehicle.

149.     The towing company and/or driver breached this responsibility to safely, without damage, tow my car to the lot destination. The act of breaching this duty directly resulted in the tow company damaging my vehicle. My car was damaged as a direct result of Todisco's negligence/negligent acts.

150.     I can provide witness corroboration that Todisco caused the damage to my vehicle and that there was no damage to my vehicle prior to the towing by Todisco.

151.     Moreover, several forms of car damage are common in terms of tow-related damage and my vehicle damage is consistent with tow-related damage. The most common type of tow-related damage that occur in improper towing practices is bumper damage and such damage done via dents, scratches, or cracks, implies negligent towing practices.

152.     Further proof that Todisco caused the damage to my car can be found in the fact that Todisco is required (either by company policy or by law) to take photo of the vehicle before towing a vehicle. There is additional proof that Todisco caused the damage to my vehicle as follows:

   a.   I have asked Todisco to produce that photo, but Todisco has refused to do so, indicating not only that 1) the photos show proof that there was no damage to my vehicle bumper prior to being towed but also that Todisco must have caused the damage, and 2) also that Todisco has acted in bad faith in refusing to show me the photo knowing that it would prove its liability for the damage[6].

   b.   Moreover, photos of my entire vehicle show that there was no prior damage to my vehicle neither to the bumper area or the muffler area.

   c.   [NB: I also took photos of my vehicle recently which show that there is no other prior damage to my vehicle].

   d.   Since the photos taken by me of my vehicle prior to, as well as after, the date of February 22, 2019 show no prior damage to my vehicle, then by logical proof there can exist no other damage to my vehicle other than that which was caused by Todisco on February 22, 2019. If there was prior damage to my vehicle, then why would recent photos of my vehicle show no such prior damage. This 100% proves that there was no prior damage to my vehicle and that Todisco's claim that there was prior damage is a flat-out lie. It also shows that Todisco's claim that it has photos showing prior damage to my vehicle is also 100% false which demonstrates misrepresentation and deception by Todisco.

153.     Todisco and its tow truck driver (Billy "Doe") did breach said duty of care by allowing its vehicle to be operated in a negligent and careless manner.

154.     As a direct and proximate result of the negligence of Todisco, its employees, agents and for those whose actions it is responsible for, I have been caused to suffer, and continue to suffer harm and damages including but not limited to, property damage to multiple areas of my vehicle requiring extensive body work repair and painting, and resulting in expensive repairs in the thousands of dollars.

155.     Also, as a consequence, not only have I been unable to fully enjoy my vehicle, but I have also been unable to trade in or sell my vehicle. [NB: I have not fixed the damage to vehicle (caused by Todisco) on my own in order to preserve evidence of the damage should it be necessary for further investigation]. My vehicle has suffered diminution of value from said damages, which again is palpable when dealing with vehicles in good condition. These losses are continuing in nature, and I will continue to suffer from said losses into the future.

156.     I therefore am entitled to and demand full compensation for damages against Todisco, in the amount to be determined at trial, including interest, costs and attorneys' fees.

157.     Todisco engaged in negligence as it relates to my vehicle and have caused property damage to my vehicle.

158.     Todisco has not exercised reasonable care in the process of towing and/or storing my vehicle.

159.     The tow-truck driver had a duty to take all reasonable precautions to prevent my vehicle from being damaged.

160.     On information and belief, Todisco also used an incorrect towing procedure to tow my vehicle. Even assuming arguendo, that Todisco used a correct towing procedure in general, it still was negligent in the execution of that procedure, causing damage to my vehicle, for which it is responsible.

---

[6] NB: Moreover, if there was damage prior to towing, there should be a tow ticket that shows any damage before hookup. But there is no such tow ticket and no such photo.

161.    The undeniable bottom line fact is that, in towing my vehicle, Todisco damaged my vehicle. At a minimum, Todisco was not careful in its handling of my vehicle in or while towing it.

162.    My vehicle was not damaged prior to Todisco's towing of it. It has not been damaged since Todisco towed my vehicle on 2-22-19. The only damage to my vehicle, that still is present to this day, is from when Todisco towed my vehicle and damaged it on 2-22-19.

163.    As mentioned before, I can also provide witness corroboration to the fact that Todisco caused the damage to my vehicle.

164.    Similarly, Matthew Mazzarella, an employee and operations manager of Todisco, admitted that Todisco caused damage to my vehicle.[7]

165.    NB: The most common damage that can come from a tow truck to a car is damage to a car's bumper. For example, a tow truck can cause damage to a car's bumper if its hook was not properly positioned to pick up the car.

166.    In my case, it is very clear from the nature of the damage to my rear bumper that it was caused by tow truck equipment (i.e., there is a deep gash that cut out a small chunk of the rear bumper, which is consistent with damage caused by a tow truck). The same applies to the damage to my muffler/muffler area. Todisco is thus liable for these damages.

167.    At one point in the communications with Mr. Mazzarella, Todisco indicated that it could fix my vehicle in their own garage or repair shop. However, Todisco did not specify what it would repair and did not specify the extent of the repairs that they would commit to doing (i.e. whether it would include a partial repair, a complete repair or a replacement of my rear bumper and muffler damage, etc.). Todisco's offer to "repair" my vehicle damage was vague and general. Moreover, on or about 2-11-20, after some discussion had already taken place between me and him by email since December 2019, surprisingly and suddenly, Mr. Mazzarella made an issue about prior damage[8]. But he did not specify the exact nature of the prior damage, where exactly it was located (i.e. left, right center, etc.), and he did not specify what Todisco would repair if it thought there to be prior damage. Todisco refused to show me the purported photos that it said it had.  I thus had no idea what exactly would be repaired by Todisco. I thus had concerns about the honesty and integrity of Todisco and could not trust that they would effectuate a proper and diligent repair of my vehicle nor could I trust that Todisco would not inflict damage to my vehicle (intentionally) in order to justify its fabrication of "prior damage" of which there was none.

168.    NB: I asked Todisco for an estimate of what it would cost to repair the damage to my vehicle, but Todisco refused[9] to give me an estimate or any indication of what would be repaired and what would be involved and what it would cost.

169.    I thus requested[10] instead that my vehicle be repaired at an independent repair shop, which under Massachusetts law, I had the right to do.

---

[7] On February 11, 2020 at 12.28pm, Mr. Mazzarella stated: *"You are also correct about damages if we cause damage we want to make sure it is taken care of any way possible because we do care about our customers vehicle regardless of why they were towed. Please provide us with an estimate for repair so we can move forward."*

[8] NB: Todisco has no evidence that my vehicle was damaged prior to Todisco's towing of my vehicle. In communicating with Matthew Mazzarella, he eventually later claimed that he had photos showing prior damage to my vehicle, but this is a false statement. I asked him to show me these purported photos of prior damage, but he refused. Evidently, he refused to show the photos of prior damage because he does not have any such photos showing prior damage to my vehicle. When asked why he will not show me these purported photos, he stated that Todisco has a corporate policy that prevents him from showing me these purported photos. This again was a false statement. Mr. Mazzarella sent me photos of other vehicles of other owners being towed (in order to show that a Dolly truck is better than a Flatbed truck for towing vehicles such as mine) but then refused to send me photos of my own vehicle. This is an unfair and deceptive act. Evidently, Mr. Mazzarella/Todisco does not have any photos that shows prior damage to my vehicle bumper or muffler. This is an unmitigated lie. Mr. Mazzarella/Todisco lied for a corrupt and malicious purpose and intent, which was to persuade me to accept lesser repairs to my vehicle or to frustrate and delay payment for repairs to my vehicle.

[9] On February 10, 2020 at 11.08am, Mr. Mazzarella stated in an email: *"I do not know the fair cost of repair. I did not ask my shop for an estimate seeing that you did not want our body shop to repair."*

[10] On February 10, 2020, at 4:43 PM, I stated in email: *"Hi Matthew, Actually, I'd like to have it fixed independently. Furthermore, I am currently out of state. Do you need me to provide a damage estimate? -Natalie"*.

170.    Todisco then gave me the impression that if and when I provided an estimate, it would then take care of paying for the damage to my vehicle.

171.    After spending time to search for and bring my vehicle to a repair shop, I then provided to Todisco not one but two estimates from two different independent repair shops. As mentioned before, I resubmitted only one estimate to Todisco, in order to simplify the matter.

172.    I also added an estimate of the cost for rental car to be used by me while the vehicle is being repaired.

173.    Yet after providing the estimate, Todisco still refused to pay for the repairs. The details of this and other points are further explained below later in this document.

174.    Thus, I suffered a financial loss and Todisco is legally responsible for my damages.

175.    I suffered harm because of Todisco's negligence. Todisco's failure to exercise care caused me damages, and as a direct and proximate result of the negligence of Todisco, I suffered injury.

176.    As a result, I have thus incurred costs and financial loss.

177.    I did not nor could not contribute to the damage to my vehicle as this is not a motor vehicle accident case with two consumers involved. My vehicle was stationary and parked at the time Todisco towed my vehicle. Todisco was solely in control of and responsible for my vehicle while it was towing my vehicle. I did not ask Todisco to tow my vehicle. It was wrongfully towed from a parking spot at hotel in Boston that I was staying at the time. I did not see or supervise Todisco's towing of my vehicle. I did not accompany Todisco while it was towing my vehicle to its storage lot in Boston. I had no part in the acts of Todisco that caused damage to my vehicle.

178.    As registered owner of the subject tow truck vehicle that caused damage to the plaintiff's vehicle, the defendant, Todisco Services, Inc., is liable under M.G.L.c. 231, s. 85A, for the negligent actions of the operator of its vehicle.

179.    As a direct and proximate result of defendant Todisco Services, Inc.'s negligence, as committed through its own negligence and the negligent acts of its agent and employee, the plaintiffs suffered damages.

180.    NB: There is no other cause of the damage to the rear bumper and muffler area of my vehicle that has or can be identified by Todisco, other than by Todisco/Todisco's tow equipment on 2-22-19. The towing by Todisco is the only cause of this damage that has been identified and that has even been acknowledged previously by Todisco and for which there is proof.

## COUNT 2 - VIOLATION OF MASSACHUSETTS GENERAL LAWS CHAPTER 93A - UNFAIR AND DECEPTIVE PRACTICES

### A. Introduction

181.    I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

182.    Todisco is engaged in trade and commerce as defined by Massachusetts General Laws, Chapter 93A.

183.    The foregoing actions and inactions of Todisco constitutes unfair and deceptive acts and practices as defined by, and in violation of Massachusetts General Laws, Chapter 93A.

184.    Plaintiffs are consumers, and Todisco, MAPFRE, Acadia, Jiten, and Bennett & Belfort are engaged in trade/commerce, as defined by 93A.

185.    Defendants engaged in unfair and deceptive acts against the plaintiff.

186.    As a direct and foreseeable consequence of Defendants' actions, the plaintiff has suffered damages.

187.    As a result thereof, the plaintiff has been and continued to be injured and suffer damages.

### B. Summary of the law

188.    Plaintiffs, repeats and reiterates each and every allegation of the complaint, in the above paragraphs with the same force and effect as if herein set forth at length.

189.    G. L. c. 93A, Section 11. General Laws c. 93A, Section 11, allows recovery for "the use or employment . . . of an unfair method of competition or an unfair or deceptive act or practice." See G. L. c. 93A, Section 2 (1994 ed.).

190.    Chapter 93A is a broadly construed remedial statute.

191.    93A can be violated even if no other law is violated. See Baker v. Goldman Sachs (D. Mass. 2013). Bad faith litigation tactics can violate 93A.  See also Trenwick America Reinsurance Corp. v. IRC, Inc., 764 F. Supp. 2d 274, 308 (D. Mass. 2011) (considering litigation tactics part of course of conduct in violation of consumer

protection law when offending party utilized "moving target [litigation] strategy" and engaged in "discovery abuses").

192.    "While there may be debate concerning whether litigation tactics alone can comprise a Chapter 93A violation, there is no debate concerning whether such tactics can be considered along with egregious, bad faith pre-litigation conduct." Small Justice v. Xcentric Ventures (D. Mass. 2014).

193.    93A can be violated for intentionally delaying payments in hope of an advantageous settlement – Northern Security Ins. v. R.H. Realty (2011).

194.    In addition, 93A has a low threshold of proof necessary to establish liability.

195.    Feeney Bros. Excavation LLC v. Morgan Stanley & Co., 2020 WL 2527851, at *9 (D. Mass. May 18, 2020) ("liability under Chapter 93A need not based on extreme or egregious behavior but may instead be based on other causes of action, such as a breach of the covenant of good faith and fair dealing or negligent misrepresentation"; citing Brewster Wallcovering Co. v. Blue Mt. Wallcoverings, Inc., 68 Mass. App. Ct. 582, 605-06 & n.55 (Mass. App. 2007), with Cance v. Carbone, 97 Mass. App. Ct. 1122 (2020) (unpub.) ("a violation of G. L. c. 93A requires, at the very least, more than a finding of mere negligence," quoting Darviris v. Petros, 442 Mass. 274, 278 (2004)).

196.    In Orion Points W. Inc. v. FJM Enters, 2020 Mass. App. Div. 15 (April 7, 2020) the court found that ongoing deception, misrepresentation, and lies constitute a knowing violation of Chapter 93A entitling plaintiff to treble damages and attorney's fees. For the court, defendant's "ongoing deception, misrepresentation, and lies" constitute a knowing violation of G.L. c. 93A entitling plaintiff to treble damages and attorney's fees.

197.    In Healy v. G/J Towing, Inc., SUCV2017-01665-BLS2, 2019 LEXIS 1225 (Mass. Sup. Ct., Dec. 18, 2019), the court found that apparent overcharge to motor vehicle owner by towing company could "rise to the level of" Chapter 93A, Section 9 violation. Plaintiff alleged that defendants (who operate a towing business in Revere) charged motor vehicle owners towed in Revere more than city ordinance and related statutes allowed, which violated Chapter 93A, Section 9. The court noted that plaintiff appeared to have a meritorious Chapter 93A claim. Pursuant to defendants' contract with the City of Revere, defendants may have overcharged plaintiff for towing services, based on the discrepancy between what they actually charged plaintiff and what they were allowed to charge motor vehicle owners. According to the court, based on those facts, plaintiff "clearly has a claim against the defendants that could even rise to the level of a c. 93A violation."

198.    The Consumer Protection Act protects both individual consumers and businesses from unfair business practices which are immoral, unethical or oppressive, or which are otherwise unfair as established by statute or common law. The statute defining unfair claims settlement practices, G.L. c. 176D § 3, prohibits "unfair or deceptive acts or practices in the business of insurance". Section 3(9) recites acts and omissions which constitute unfair claim settlement practices.

199.    Under Chapter 93A, the standard is "unfair or deceptive." A plaintiff does not need to prove that conduct was unfair "and" deceptive; deceptiveness alone or unfairness alone is enough.

200.    The public policy behind c. 93A and the punitive impact of multiple damages awards indicates that upholding contract waivers in instances where a party commits knowing or willful misconduct "would do violence" to the punishment and deterrence goals of multiple damages awards.

201.    In Alo, LLC v. L3 149 Newbury St., LLC 2022 Mass. LCR LEXIS 115 (Mass. Ld. Ct. Dec. 21, 2022), the court cited that one business "stringing along" another business is a form of commercial extortion (and a valid Chapter 93A claim). The court noted that a "stringing along" 93A violation requires allegations of misrepresentation and coercion resulting in unfavorable result.

202.    The District of Massachusetts recently confirmed that he demand letter requirement "is not meant to impede the vindication of consumers' rights." Therefore, the obligations to "reasonably describe" the unfair or deceptive act and the injury suffered are interpreted liberally. See Lee v. Conagra Brands, Inc., and Dumont v. Reily Foods Co., where the court found basic description sufficient to raise the "reasonable inference . . . that plaintiff suffered a monetary injury when she purchased the allegedly mislabeled product."

203.    Pre-trial suppression of crucial evidence, the creation of an alternative scenario based upon fictitious facts, and improper manipulation of critical witness testimony by insurance company violated 93A. "Deliberate or callously indifferent acts designed to conceal the truth, improperly skew the legal system and deprive fair compensation for injuries constitutes misconduct that warrant sanction of multiple damages under M.G.L. c. 93A. See Anderson, et al. v. American International Group, Inc. et al.

204.    An action pursuant to G. L. c. 93A is 'neither wholly tortious nor wholly contractual in nature.'" Id. at 746, quoting from Standard Register Co. v. Bolton-Emerson, Inc., 38 Mass. App. Ct. 545, 548 (1995). Where the consumer protection claim under G. L. c. 93A is a statutory claim more closely resembling the tort of misrepresentation, it is treated as a tort. See Kitner, supra at 746-747. See also Standard Register Co., supra at 550 ("In the present case, the misrepresentations of the defendants are at the core of Standard Register's claim for a violation of G. L. c. 93A, § 11, thereby making it a chapter 93A claim which sounds in tort rather than contract"). Cf. Schwartz v. Travelers Indem. Co., 50 Mass. App. Ct. 672, 675, 677 (2001) (applying four-year statute of limitations to a c. 93A claim where "conduct prohibited by G. L. c. 176D, and made unfair and deceptive by G. L. c. 93A, § 9, creates an action independent from the contract"). Accord Hearn v. Rickenbacker, 428 Mich. 32, 41 (1987) (actions for fraud and negligence fall outside the policy of insurance, and contract provision barring suits "on [the] policy" after one year inapplicable); Dunaway v. Allstate Ins. Co., 813 N.E.2d 376, 385, 379, 387 (Ind. Ct. App. 2004) (policy clause providing that "any suit or action must be brought within one year" inapplicable to independent tort). Contrast Canal Elec. Co. v. Westinghouse Elec. Corp., 406 Mass. 369, 378-379 (1990).

205.    "[A] negligent misrepresentation of fact the truth of which is reasonably capable of ascertainment is an unfair and deceptive act or practice under G. L. c. 93A, § 2(a)." Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 62 (2004), quoting from Golber v. BayBank Valley Trust Co., 46 Mass. App. Ct. 256, 261 (1999). Glickman, 21 Mass App. Ct. at 235.

206.    Intentional misrepresentation also rises to the level of a c. 93A violation. See Giuffrida v. High Country Investor, Inc., 73 Mass. App. Ct. 225, 239 (2008), citing Zayre Corp. v. Computer Sys. of America, Inc., 24 Mass. App. Ct. 559, 570 n.23 (1987) (conscious misrepresentation may be so seriously deceptive as to permit recovery under c. 93A, § 11, where a party gave "false assurances as to future conduct, even though the party's later actions, taken contrary to those assertions, were contractually permitted").

207.    The mere mention of misrepresentation and fraud is not the equivalent of a finding of false pretenses, false representation, or actual fraud for purposes of section 523(a)(2)(A). See In re Baylis, 313 F.3d 9, 17 (1st Cir. 2002) (exceptions to discharge are narrowly construed). Even if the judgment was based solely on Mass. Gen. Laws ch. 93A, "chapter 93A violations and fraud are not synonymous, and . . . chapter 93A liability may be premised on conduct other than fraud." Stoehr v. Mohamed, 244 F.3d 206, 209 (1st Cir. 2001). The trebling of damages pursuant to Mass. Gen. Laws ch. 93A, § 9, allows trebling for willful or knowing violations of section two of the statute. The statute does not require a court to find false pretenses, false representation, or fraud before it can treble the damages.

208.    G.L. c. 176D, §3(9)(c) requires insurance companies to provide training to claims adjusters on Massachusetts tort law, and their failure to do so resulted in a bad faith failure to promptly investigate her claim and to fairly settle it.

## C. Breach of Duty of Care and Duty of Good Faith/Fair Dealing

209.    I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

210.    By entering into the towing business and by obtaining a license to be as a tow operator by the state, Todisco undertook a duty of care to protect my vehicle from damage during towing and during storage.

211.    Todisco had a legal obligation to maintain the security and safety of my vehicle upon towing it.

212.    Todisco owed me a duty to promptly fix the damage to my vehicle.

213.    Todisco refused to promptly fix my vehicle thereby breaching its duty to me. Todisco, by so doing, has also unjustly enriched itself at my expense and to my harm.

214.    Todisco had a duty to not lie to me about the damage to my vehicle, fabricating lies that there was prior damage to my vehicle in order to get out of paying for the damage to my vehicle or to lessen the amount it should pay.

215.    Todisco also owed to me a duty of good faith and fair dealing and thereby were obligated to consider my welfare, refrain from acting for purely selfish motives or for private gain and to desist from destroying or injuring my rights.

216.    By making false and misleading representations to me, Todisco breached its duty of good faith and fair dealing to me.

217.    Todisco failed to deal with me honestly, fairly, and in good faith.

218.    Todisco owed me a duty to not mislead me or to make false statements to me. Todisco did mislead me and make false statements to me thereby breaching its duty to me. Todisco has acted in bad faith.

219.    Todisco owed me a duty to settle this matter in good faith. Todisco refused to settle this matter in good faith thereby breaching its duty to me. Todisco has acted in bad faith.

220.    Through its actions and inactions, Todisco has breached its duty of care, good faith and fair dealing to me, intentionally engaged in wrongful conduct, and did knowingly injure or otherwise harm my rights and interests.

221.    The above represents an intent by Todisco to inflict harm upon me.

222.    As a result, I suffered damages.

### D. Undue & Unnecessary Delay by Todisco

223.    I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

224.    Todisco engaged in actions that have resulted in the unnecessary delay of the repair of the damage to my vehicle in order to save money or to avoid payment for repairs to my vehicle for damage that it caused. This is an unfair and deceptive trade practice.

225.    Todisco had knowledge of the damage to my vehicle since February 22, 2019 and that Todisco was responsible for this damage or at least that I had claimed that Todisco was responsible for said damage.

226.    What is the explanation for why Todisco did not act on my damage claims form submitted on 2-22-19? Why did Todisco not submit the damage claim to their insurance company from 2-22-19? Why was there no follow-up with me after I submitted the claims form to Todisco on 2-22-19?

227.    Clearly, Todisco's acts have been designed to avoid assuming liability for this damage.

228.    Notwithstanding the fact that Todisco's (purported) insurance company should likely reimburse Todisco for its negligence or other intentional acts in this matter, Todisco wrongly sought to transfer the risk or liability for costs to me by forcing me to go uncompensated for over a year.

229.    NB: Under Massachusetts law, tow truck companies and operators are responsible to ensure that vehicles towed are not damaged and that due care is made to prevent damage and theft of and from the vehicle in their care.

230.    Todisco engaged in dragging things out (i.e. in delaying tactics relating to my damage claim), in order to avoid paying costs to repair or replace the rear bumper and muffler of my vehicle, creating undue hardship, inconvenience and damages to me.

231.    Despite the fact that I provided Todisco with photos, two damage repair estimates, and other information showing that I suffered damage to my vehicle by Todisco, and despite Todisco having its own photos of said damage and having received my claim for damages on February 22, 2019 (all of which would allow Todisco to properly investigate the claim), Todisco has refused to pay the claim for damages to my vehicle.

### E. Misrepresentation & Deception by Todisco

232.    I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

233.    Todisco made false and misleading representations to me, which constitutes unfair and deceptive practices within the meaning of Mass. Gen. L. ch. 93A, #2 and 9.

234.    Todisco engaged in intentional misrepresentation.

235.    Todisco engaged in active concealment of the truth.

236.    Todisco engaged in hostile, negative, uncooperative, antagonistic, and unhelpful attitude towards me.

237.    Todisco engaged in lies, deception and unethical tactics and included trying to create skewed email records by twisting what was discussed.

238.    Todisco engaged in deceptive, unfair or oppressive acts. Todisco engaged in misrepresentation including dishonest communication/activity and non-transparency with me.

239.    Todisco refused to provide photos purportedly taken by Todisco that purportedly show prior damage to my vehicle in order to cover up its misrepresentations and unfair/deceptive acts.

240.    Todisco knowingly caused me emotional distress by making false statements about prior damage to my vehicle and by delaying the resolution of my claim.

241.    [NB: After consideration of legislative changes to Chapter 93A made in 1979, the SJC, in Hershenow v. Enterprise Rent-A-Car Co. of Boston Inc., 840 N.E. 2d, 526 (2006), stated these changes were "intended to permit recovery when an unfair or deceptive act caused a personal injury loss such as emotional distress, even if the consumer lost no 'money' or 'property'].

242. Todisco misrepresented that it would cause its insurance company (MAPFRE Insurance/Commerce Insurance) to process my claim, thereby giving me the misleading impression that it had a policy with said insurance company that covered my claim (i.e. under a garage-liability policy) when in fact it did not.

243. Hence, Todisco intentionally misrepresented the nature of its relationship with MAPFRE/Commerce insurance in order to further frustrate, delay and ultimately get out of paying my damage claim. By doing so, Todisco engaged in deceptive conduct and violated 93A.

244. Similarly, by proposing a resolution to my claim that was misleading, disingenuous, legally unenforceable[11] and futile because it had no applicable policy with MAPFRE/Commerce, Todisco violated Chapter 93A. This proposal or course of action by Todisco was knowingly "doomed to fail", and thus was in violation of Chapter 93A.[12] See also Piers v. Wheeler and Taylor, Inc., 8 Mass. Law Reporter 410 (1998) ("Representing to a buyer of a home that the property is free of lead-contaminated paint without verifying that fact constitutes willful misconduct subjecting the seller and the seller's real estate agent to multiple damages under c.93A.").

### F. Illegal Steering by Todisco

245. I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

246. It should be noted that Massachusetts law requires that a consumer can choose a repair shop of their own choice.

247. When I stated that I wanted to choose my own repair shop, Todisco tried to pressure me into using its repair shop including by twisting the record to suggest that I had denied their offer to repair my vehicle (which I had to correct several times by email). This again was deceptive conduct intended to manipulate me into not choosing my own repair shop. See Duclersaint v. Federal National Mortgage Association, 427 Mass. 809, 696 NE2d 536 (1998) ("a practice may be deceptive if it reasonably could be found to have caused the plaintiff to act differently than he otherwise would have acted.").

248. Similarly, Todisco's lies about prior damage, its refusal to show pictures of said purported prior damage, and later acting as if it would pay the damages once an estimate was provided but then ultimately switched to begin insurance processing after a year of sitting on my claim and then submitting my claim to an insurance company that did not cover my claim, all were done to pressure me to go without payment for my damages and/or to accept a lesser value for the damage to my vehicle and/or to illegally steer me to use their repair shop. Todisco signaled to me that by not going with their repair shop, I made a bad decision which would result in my being penalized by not getting an opportunity to fix my vehicle at all or in my not getting (or delaying) any payment to fix the damage at all.

249. This also constituted or could be construed as bad faith extortionate tactics.

### G. Refusal to Accept Repair Estimates and Refusal to Negotiate in Good Faith with Repair Shop of My Choice

250. I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

251. According to Massachusetts law, I have the following rights:

252. I have the right to have my vehicle towed to any location that I choose.

253. I do not have to get multiple appraisals. Only one will suffice.

254. Todisco is responsible for payment to restore my vehicle to pre-accident condition.

255. Todisco must negotiate in good faith with me and with the shop of my choice.

256. Todisco has refused to accept estimates from two repair shops. Todisco has refused to contact the repair shops to inquire about the estimates. If Todisco had questions about the details of the estimates, Todisco should have contacted the repair shops. Instead Todisco has concocted a wild conspiracy theory suggesting or implying that the two repair shops may have sought to defraud Todisco with estimates that are over-priced, or otherwise that the scope of the work to be repaired has been fraudulently enlarged beyond what is required to effectuate complete a proper repair of the damage to my vehicle. Todisco has not investigated this matter to make any fact-based determination of such speculative suspicions. In fact, after I contacted the repair shops

---

[11] NB: See Jones Lang LaSalle New Eng., LLC v. 350 Waltham Associates, LLC, No. 17-cv-11784-IT, 2020 WL 419516, at *1 (D. Mass. Jan. 27, 2020).

[12] NB: See Kaur v. World Bus. Lenders, LLC, No. CV 19-11364-WGY, 2020 WL 888015, at *1 (D. Mass. Feb. 24, 2020).

asking for detailed explanations for the items listed on the estimate that Todisco said it found suspect, and after I relayed this information explaining the validity and requirement for the items listed by the repair shops, and after Mr. Mazzarella stated by email that he now understood why these items were included, then all of sudden in its 93A response of 3-10-20, Todisco has unwound this position and has taken the position that the estimates are illegitimate or untruthful. This is a highly unreasonable bad faith position to take and it is done in order to avoid paying for the damage to my vehicle. Todisco has refused to resolve this matter in good faith. Todisco has manufactured a fake dispute relating to the estimates, and has done so in bad faith, knowing full well that the estimates represent legitimate repairs needed to restore my vehicle to pre-accident condition.

### H. Bad Faith Delay in Referral to Insurance Company/Bad Faith Referral to Non-Applicable Insurance Company

257.  On or about 2-19-20, Todisco referred my claim to MAPFRE/Commerce Insurance company.

258.  Todisco has no garage/garage keepers' liability policy or other applicable policy with MAPFRE that covers damage to vehicles while being towed or while being stored at a tow facility. MAPFRE denied the claim on the grounds that Todisco has no applicable insurance policy to cover the claim.

259.  Todisco has been in business since the year 2000 (for at least 20 years). Todisco knew that MAPFRE did not cover its garage/garage keepers' liability claims. Yet Todisco still referred my claim to MAPFRE knowing that it would be denied and knowing that it was "doomed to fail". It cannot be the first incident that a consumer has required payment for a vehicle damaged by Todisco. Todisco must have known that MAPFRE did not cover such claims for Todisco. Todisco intentionally sent my claim to MAPFRE, knowing it would be denied.

260.  To add insult to injury, after I informed Todisco of this problem with MAPFRE, Todisco refused to address the issue or correct the issue, which indicates that this was intentional.

261.  No one from Todisco has addressed the issue of the lack of insurance or the filing of a claim with the wrong insurance by Todisco, in addition to other unfair and deceptive acts intended to undermine, delay or 'game' the claims process pertaining to compensation for damage to my vehicle. The law requires Todisco to have garage/garage-keepers liability insurance to cover damage to vehicles towed by Todisco. This matter was sat on/delayed by Todisco since February 22, 2019. All manner of delay has been interposed by Todisco to try to get out of paying for the damage to my vehicle and/or to use unfair/deceptive means intended to frustrate resolution of this claim.

262.  Todisco had no intention to refer my claim for processing and coverage under a garage/garage-keepers liability insurance policy. Todisco intended to have MAPFRE generate a denial, with the intent that this would dissuade me from further pursuing the claim.

263.  Todisco evidently has handled my claim in an arbitrary, capricious, and bizarre manner, which not only indicates unfair and deceptive acts but also intent to inflict emotional distress. Todisco's marked hostility and antagonism also indicates an intent to treat me in a subpar, disrespectful, dismissive, and disparate manner.

### I. Todisco's Bad Faith 93A Response/Refusal to Settle

264.  I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

265.  Todisco has committed an unfair claims settlement practice in violation of G.L. c. 93A, which include the following unfair practices[13]:

    a.  "Refusing to pay claims without conducting a reasonable investigation based upon all information."

    b.  "Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear."

    c.  "Failing to provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."

    d.  By failing to conduct a reasonable investigation, by failing to effectuate a prompt, fair and equitable settlement in which liability had become reasonably clear, and by pursuing unreasonable arguments to defend against my reasonable demand and by refusing to settle in good faith thus forcing me to prepare

---

[13] NB: These are examples taken from cases that address violations of 93A by an insurance company that has engaged in unfair claim settlement practices in violation of Chapter 176D. Given the similarities of these violations and the fact that Todisco is the party who gave the impression that it would handle and administer payment of my claim, they equally apply in this context as violations of 93A as well.

to file a lawsuit, Todisco has further engaged in willful unfair and deceptive acts. See Anderson v. National Union Fire Ins. Co., SJC-12108, 2017 WL 445244, at *1 (Mass. Feb. 2, 2017) (where judge "concluded that these violations were willful and egregious, warranting an award of punitive damages under Chapter 93A, §9(3). Accordingly, he awarded the plaintiffs treble damages…").

266.   Todisco refused, in bad faith, to offer or provide prompt resolution of this matter.

267.   It is also an unfair claim settlement practice to make an offer in bad faith, using extortionate tactics. By attempting to illegally steer me away from using my own repair shop, by accusing me of denying Todisco's offer to repair my vehicle and by making bad faith accusations that the estimates from my repair shops were suspicious or false, and by sending my claim to an insurance company for which they had no policy to cover the claim, Todisco has not only illegally tried to steer me from my repair shops, but has also engaged in bad faith extortionate tactics. See Duclersaint v. Federal National Mortgage Association, 427 Mass. 809, 696 NE2d 536 (1998) ("a practice may be deceptive if it reasonably could be found to have caused the plaintiff to act differently than he otherwise would have acted.").

268.   As a result of the unfair and deceptive acts or practices alleged herein, I sustained injury.

269.   In consequence of Todisco' unfair and deceptive acts, I suffered and will continue to suffer damages including, but not limited to, financial and other losses, pain and suffering, and emotional distress.

270.   Todisco acted intentionally, willfully, and with reckless disregard for my rights.

271.   Todisco's actions, statements and omissions alleged herein were committed willfully and knowingly.

272.   Moreover, in 2020, I sent more than one written communication to Todisco describing, in one form or other, the damages and unfair acts or practices described above, and the injuries suffered as well as demanding relief or that action is taken to remedy the situation by Todisco. However, Todisco not only refused to accept the settlement offer but also refused to make any reasonable offers of relief to me.

273.   Instead, Todisco told me that it would all of a sudden not handle paying my claim but that it would then (for the first time after a year had passed since I filed my claim with Todisco on February 22, 2019) forward my claim to its insurance company. However, Todisco's insurance company (MAPFRE) denied my claim on the grounds that Todisco did not have any applicable policy with it. Evidently, Todisco did not purchase/obtain the required garage/garage keepers' liability insurance from MAPFRE, as required by the state of Massachusetts.

274.   This refusal to grant relief was done in bad faith with knowledge or reason to know that these acts violated Massachusetts Laws. Similarly, this referral of my claim to MAPFRE for processing (when Todisco knew that it had no policy with MAPFRE) was done in bad faith, and was done to dissuade me from persisting with getting my vehicle damage repaired and to frustrate me by further delay and by a drawn out circuitous process.

275.   Todisco's refusal to grant relief upon demand was done in bad faith with knowledge or reason to know that the acts and practices complained of violated Chapter 93A.

276.   The acts of Todisco were willful and knowing acts in violation of G.L. c. 93A.

277.   The failure of Todisco to make a reasonable offer of settlement is a willful and knowing violation of G.L. c. 93A.

278.   Eventually, having exhausted all attempts to reason with and negotiate with Todisco (including escalating the matter to owner Pat Todisco who has not responded in kind), I submitted/served a demand letter for relief under G.L. c. 93A to Todisco on or about February 20, 2020, which clearly outlined the facts, my causes of action and my damages. [NB: Pursuant to Massachusetts General Laws Chapter 93A, the Plaintiff made a written formal demand for relief to Todisco. But Todisco either failed to respond, and/or responded in bad-faith and/or failed to provide the relief demanded by the Plaintiff, in violation of Massachusetts General Laws Chapter 93A.]

279.   Todisco nevertheless has refused to offer any reasonable settlement of this claim. In bad faith, Todisco made several false statements in its 93A response of 3-10-20, and completely fabricated certain factual assertions made by it.

280.   Despite being provided with a detailed written demand for settlement, and a written demand for relief pursuant to M.G.L. c. 93A, and despite my initial claims submitted to Todisco in February 2019 and also despite then further attempts to follow-up thereafter but to no avail until December 2019, and then finally despite other numerous email correspondences with Todisco, starting in December 2019 through February 2020, still yet Todisco has refused to make a reasonable and good faith offer to settle the claim, forcing me to

send a demand letter and now to initiate legal action. See Duclersaint v. Federal National Mortgage Association, 427 Mass. 809, 696 NE2d 536 (1998) ("a practice may be deceptive if it reasonably could be found to have caused the plaintiff to act differently than he otherwise would have acted.").

281.    The ongoing unfair and deceptive acts and practices of Todisco has forced me to file suit, as Todisco refuses to tender any reasonable settlement offer.

282.    I am entitled to an award of up to treble damages, in connection with this claim, pursuant to Massachusetts General Laws 93A.

283.    NB: Todisco, in its 93A response of 3-10-20, has also frivolously and baselessly alleged that the first 93A demand letter that I sent "did not comply with 93A requirements" and have also used this as a basis to refuse to provide a reasonable offer of settlement. This is in complete bad faith because in the first demand letter sent on February 20, 2020, I laid out in adequate detail a clear notice of wrongs done by Todisco in violation of 93. The requirements for compliance for a 93A demand letter are liberal. There are no technical pleading standards for a 93A demand letter and the standards are considerably basic.

284.    See McCarthy v. Quirk Nissan, Inc., 2009 Mass. App. Div. 159 (2009) ("…we note that it is well established that a G.L. c. 93A demand letter is sufficient if it describes the 'plaintiff's injuries in sufficient detail to permit [the defendant] reasonably to ascertain its exposure.' Richards v. Arteva Specialties S.A.R.L., 66 Mass. App. Ct. 726 , 734 (2006), quoting Simas v. House of Cabinets, Inc., 53 Mass. App. Ct. 131 , 140 (2001). See, e.g., York v. Sullivan, 369 Mass. 157 , 162-163 (1975), quoting Slaney v. Westwood Auto, Inc., 366 Mass. 688 , 704 (1975) (demand letter sufficient for G.L. c. 93A purposes where it gave defendant an opportunity to review the facts and law involved to see if the requested relief should be granted or denied and to enable [it] to make a reasonable tender of settlement in order to limit the recoverable damages….See, e.g., Richards, supra at 734 (demand letter sufficient where it describes the injury in enough detail to permit the defendants reasonably (even if only roughly) to ascertain their exposure")].

285.    Hence, Todisco has again engaged in misrepresentation, false statements, misleading statements about the law in order to deceive me, a pro se party, and to engage in flat out deceptive conduct designed to further harm, injure me and deprive me of my rights as a consumer.

### J. Unfair & Deceptive Debt Collection by Todisco / Violation of FCDPA and Massachusetts Debt Collection Act

286.    I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

287.    Todisco towed my vehicle to its own lot on February 22, 2019.

288.    When I arrived at the lot, a Todisco employee (Don) told me that I owed a debt to Todisco of $144 and that I had to pay that debt in order to retrieve my vehicle from Todisco.

289.    Because Todisco held possession of my vehicle and because I was stranded and without transportation, Todisco used the communication and situation (outlined in paragraphs 14 -21 above) to force me to first pay the debt of $144 and then after I paid the debt, to sign an invoice.

290.    By making these statements and representations to me, Todisco was engaged in debt collection communication with me as a consumer. Hence, under both FDCPA and MDCPA, Todisco was a debt collector and I was a debtor.

291.    On March 10, 2020, Todisco, in its reply to my first 93A demand letter, stated that I had signed a form releasing Todisco of all liability for damage.

292.    Hence, Todisco engaged in trickery and deception when it told me on February 22, 2019 that I was not signing a liability waiver. Hence, it engaged in unfair and deceptive practice associated with the collection of a debt. See Hopkins v. Liberty Mutual Insurance Co., 434 Mass. 556, 750 NE2d 943 (2001) ("a claim against an insurance company for unfair settlement practices arising from a single act can constitute an actionable violation of Chapter 176D and Chapter 93A.").

293.    Todisco made no claim that liability was waived when I was communicating with Mr. Mazzarella since December 2019 through February 2020. In fact, Todisco admitted liability and asked to have my car repaired at their own shop. The only time that this fabricated argument about signing a liability waiver was made, was on 3-10-20, which was over a year after it already accepted my damage claim on 2-22-19 and which was months after Todisco had already admitted liability during email discussions with its operations manager Mr. Mazzarella, and this assertion was only made for the first time when it sent a reply to my 93A demand via its

lawyer. Todisco has changed its position in bad faith at the very last minute and thus further reflects unfair and deceptive acts, in order to refuse to promptly and reasonably settle the matter. See Duclersaint v. Federal National Mortgage Association, 427 Mass. 809, 696 NE2d 536 (1998) ("a practice may be deceptive if it reasonably could be found to have caused the plaintiff to act differently than he otherwise would have acted.").

### K. Pattern of Racketeering Activity through Deceptive Schemes to Defraud Consumers

294.   I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

295.   The Racketeer Influenced and Corrupt Organizations Act of 1970, commonly known as RICO, although most known to be used in criminal law context, has a component that allows anyone to file suit in civil court if they have been a victim of racketeering, which encompasses more than 30 individual illegal acts or crimes, from bribery to fraud.

296.   The RICO statute contains a provision that allows for the commencement of a civil action by a private party to recover damages sustained as a result of the commission of a RICO predicate offense.

297.   To bring a RICO civil suit, a plaintiff has to show that a person or business is conducting the affairs of an enterprise through a pattern of racketeering, and that they were harmed by members of an enterprise who committed a pattern of at least two illegal acts.

298.   The standard of proof (the preponderance of the evidence) is low, rather than beyond a reasonable doubt.

299.   Both the criminal and civil components allow the recovery of treble damages (damages in triple the amount of actual/compensatory damages) plus attorney's fees.

300.   NB: In 2019, A recent complaint that shows how broadly the law can be applied to areas far outside organized crime is the RICO lawsuit filed in December against Harvey Weinstein, the Weinstein Company and its directors, and others. The complaint accuses them of helping Mr. Weinstein cover up a pattern of sexual harassment through what it calls the "Weinstein Sexual Enterprise." The class action, filed on behalf of women who dealt with Mr. Weinstein, claims that the enterprise was designed "to harass, threaten, extort and mislead both Weinstein's victims and the media to prevent, hinder and avoid the prosecution, reporting or disclosure of his sexual misconduct." In the Weinstein case, the plaintiffs claim that part of covering up the harassment involved obstruction of justice and "multiple instances of mail and wire fraud" to show the criminal pattern, and that by acting to help Mr. Weinstein, the defendants formed an enterprise alleged to be an "association in fact."

301.   Several state and federal fraud statutes make it a crime to engage in a "scheme or artifice to defraud," so proving deceptive conduct can be the basis for a RICO lawsuit, including in many cases, being misled in ways involving mail or wire communications, such as emails or bank transactions, that formed a pattern of racketeering activity.

302.   In my case, Pat Todisco, Matthew Mazzarella and Don, along with others, have contrived a scheme to defraud me, and the public, by engaging in a pattern of illegal conduct and racketeering activity. [NB: There are Complaints of Other Consumers (on BBB and Yelp) Showing That They Were Subjected to The Same or Similar Tactics & Showing Pattern of Conduct by Todisco]. This includes activity designed to delay, frustrate, extort, and mislead consumers towed by Todisco in order to prevent, hinder and avoid payment of damages to vehicles caused by Todisco and its employees and agents.

303.   Similarly, the MAPFRE/Commerce insurance company is being used by Todisco as part of its scheme to deny consumers coverage of payment for vehicle damage. Todisco sends claims to MAPFRE who then denies these claims because it has no applicable policy to cover said claims.

304.   On information and belief, many consumers are not sophisticated enough to realize said scheme or to fight back with the necessary legal action in court, and thus they are defrauded and deprived of their rights by Todisco. See Schubach v. Household Finance Corporation, 375 Mass. 133 (1978) ("We reject the argument that an act or practice which is authorized by statute can never be an unfair or deceptive act or practice under Section 2 (a) of G. L. c. 93A. The circumstances of each case must be analyzed, and unfairness is to be measured not simply by determining whether particular conduct is lawful apart from G. L. c. 93A but also by analyzing the effect of the conduct on the public.").

305.   Based on all of the foregoing, Todisco has engaged in a predatory fraudulent scheme to deny consumers payment for damage to their vehicles caused by Todisco. Evidently, this constitutes a pattern and practice,

forming part of a racket by Todisco designed to defraud and scam the public via these unfair and deceptive practices.

## L. Intentional Common Law Fraud

306.    I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

307.    The fine print at the bottom of the invoice was not negotiated but was unilaterally inserted at the bottom of the invoice by Todisco. NB: Incorporated into this claim are several additional arguments, such as the fact the agreement was an improper contract of adhesion since I did not have a meaningful opportunity to negotiate it. Todisco's invoice was effectively a take-it-or-leave-it offer, no negotiation of the fine print on the invoice took place, and I had no bargaining power as a person who had their vehicle involuntarily towed by Todisco. The boilerplate language of the fine print on Todisco's invoice was not negotiated nor was there any opportunity for me to consult a lawyer before signing the invoice. The disparity in bargaining power between the parties is evident. I was also under duress.

308.    I had no lawyer present to review the fine print of the invoice. The invoice was only presented to me to sign after I had already paid the fee with my credit card. I had no ability to bargain or negotiate the fine print. But I was led to believe that none of the fine print would even matter because it did not apply.

309.    Todisco induced me to sign the invoice by telling me that I was simply certifying that I was legally authorized to take possession of the vehicle and that I was simply signing as "payer", indicating that I had paid the fee to the pick-up the vehicle.

310.    Then, after more than one year had passed, for the first time, Todisco asserted that it refused to pay my claim because I had signed a contract waiving liability for damage to my vehicle (i.e. by invoking the fine print as a basis to assert that I had waived liability).

311.    This meets the definition and criteria for intentional common law fraud.

312.    Todisco induced me to sign an invoice by misrepresenting that it was only a receipt and that it had no intention to invoke the fine print at the bottom of the invoice, by unilaterally inserting the fine print at the bottom of the invoice, by presenting the invoice to me after I had already paid the retrieval fee and immediately before requiring that I sign it. There were no negotiations of the invoice or the fine print on the invoice. Moreover, in the circumstances, Todisco's fraudulent assurances, and deceptive acts, resulted in my signing the invoice purportedly only as a receipt.

313.    As shown in case law for a common law claim of fraud, I was entitled to rely on Todisco's representation that the fine print on the invoice did not apply, especially because the fine print was unilaterally drafted and placed at the bottom of the invoice and was only shown to me immediately prior to Todisco's request that I sign it.

314.    Intentional common law fraud is related to the claim of unfair & deceptive acts under 93A and as such carries a potential award for attorney fees and up to treble damages. Common law fraud can be the basis for a claim of unfair or deceptive practices under the statute, see PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975); Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 504 (1979), and an intentional fraud can constitute a basis for the multiplication of damages. A finding of intentional common law fraud is an appropriate basis for a multiple damage claim of unfair or deceptive practices under G. L. c. 93A, the Consumer Protection Act.

## M. Hostile Treatment/Uncooperative Conduct as Arbitrary/Capricious Mistreatment

315.    I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

316.    Todisco has been hostile, negative, uncooperative, antagonistic, and unhelpful in its attitude and communications towards me. Todisco also engaged in a biased/negative/hostile framing of my attempt to get my vehicle fixed. Todisco engaged in deception/deceptive acts and unfair or oppressive acts towards me and this served to deprive me of rights, promises and the duty it owed to me.

317.    Todisco has behaved in a markedly hostile manner including but not limited to when it affirmatively refused to adhere to its promise and duty to repair my vehicle and when it tried to frame or characterize my attempt to pursue my damage claim as a form of subterfuge on my part, when there is no reasonable basis to assert or suspect subterfuge. In so doing, Todisco engaged in arbitrary and capricious mistreatment of me which qualifies as markedly hostile conduct.

318.    In the commercial context, "markedly hostile" conduct by a commercial operator includes conduct that is profoundly contrary to the manifest financial interests of the merchant and/or its employees, is far outside of widely accepted business norms; and/or is arbitrary on its face.

319.    Todisco has been markedly hostile, uncooperative, unfair in its decision to refuse and/or delay processing of my claim for about a year after I submitted my damages claim as of February 22, 2019 and then its decision to refuse to pay the claim even after I diligently pursued the claim, and then the constant engagement thereafter in game-playing, subterfuge and moving of the "goalposts" as well as other deceptive acts, and then ultimately the refusal to settle the claim in the end (as alleged in the above paragraphs), is far outside of widely-accepted business norms and is extreme and arbitrary on its face.

320.    Moreover, the unfair and deceptive practices by Todisco described herein was so arbitrary that it reflects conduct detrimental to its business/financial interests. The flagrant and blatant violation of my rights was detrimental to its financial interests, as it invited not only potential negative effects on its brand but also legal action including the attendant legal costs and exposure. Todisco's conduct is now forcing legal action to be filed and this indicates an arbitrary and detrimental approach.

321.    Viewing these facts in the light most favorable to me as a prospective plaintiff, it is possible to construe Todisco's conduct, including its failure to adhere to its promise, and duty to repair my vehicle as well as its refusal to settle my damage claim, as "contrary to [its] financial interests'" and "outside of widely accepted business norms.'" See Christian v. Wal-Mart Stores, Inc., 252 F.3d (6th Cir. 2001) at 871.

## O. Violations of Massachusetts Law Governing Towing/Towing Operations

322.    I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

323.    Todisco removed and towed my vehicle without my consent.

324.    Plaintiffs rely on state regulations, statutes and common law that is designed to hold a business to a "standard of *lawfulness.*" *See J.E. Pierce Apothecary, Inc.* v. *Harvard Pilgrim Health Care, Inc.*, 365 F.Supp.2d 119, 145 (D. Mass. 2005) (emphasis in original). Under the regulations of the Attorney General of Massachusetts, an act or practice violates Chapter 93A, § 2 if it "fails to comply with existing statutes, rules, regulations or laws" meant for the protection of the public's health, safety or welfare. 940 Code Mass. Regs. 3.16(3).

325.    Massachusetts state law has a more expansive understanding of unfair competition than do other states. Cf. Checker Cab Philadelphia, Inc. v. Uber Techs., Inc., 689 Fed.Appx. 707, 709 (3d Cir. 2017) (explaining that, under Pennsylvania law, unfair competition is limited to an entity passing off its product as another, dishonest statements, tortious interference with contract or intellectual property theft) (citations omitted); Greenwich Taxi, Inc. v. Uber Techs., Inc., 123 F.Supp.3d 327, 340 (D. Conn. 2015) (stating that, under Connecticut law, unfair competition is guided by the Federal Trade Commission's "cigarette rule"). Chapter 93A, by contrast, renders violations of public safety regulations actionable. See 940 Code Mass. Regs. 3.16(3).

### i. Illegal Steering

326.    I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

327.    According to Massachusetts Regulation 212 2.0.4, section (c) Contact with Claimant and Selection of Repair Shop, "No staff or independent, appraiser, insurer, representative of insurer, or employer of an independent appraiser shall refer the claimant to or away from any specific repair shop or require that repairs be made by a specific repair shop or individual."

328.    No tow company has the legal right to insist that I should go to one body shop over another. It is against Massachusetts regulations for anyone representing a tow company to steer me to their repair shops or away from the shop of my choice.

329.    A tow company also cannot tell me that they won't pay for the repairs completed in a body shop of my choosing, or that the repair costs will be higher. [NB: A tow company's motivation for doing this is to increase their profit margins, often at the expense of the quality and safety of the repair].

330.    Tow companies are not permitted to refuse to pay for any necessary procedures that are critical for proper and complete repair of my vehicle, which is not in my best interest.

331.    Steering is designed to direct customers to a shop that the company owns or "prefers".

332.    Steering refers to the attempt to steer a consumer to a tow company's preferred body shop to have the repairs done. Steering is illegal in Massachusetts. Consumers have the right to not be intimidated or coerced

into taking their vehicle somewhere just because the tow company wants them to use a particular shop. By law, consumers have the right to have their vehicle repaired by the repairer of their choice.

333. Examples of attempts by tow companies to try to steer consumers include (but are not limited to) claiming that the tow company will not pay for a rental, or doing things to drag out the time to approve coverage of the claim to repair the vehicle. This also includes tactics such as finding fault with the estimates from the repair shop that the consumer chooses. Some tow companies will say or do anything that may make a consumer think they have made the wrong decision by NOT choosing the tow company's repair shop.

334. Tow companies engage in steering for the following motives: a) to cut repair costs at the consumer's expense; b) to offer shops work with strict guidelines only to perform quantity of repairs not quality repairs; c) to control what types of parts are put on the vehicle (i.e. the cheapest available); d) to control what vendors the body shops get parts from (i.e. the cheapest available); e) to control the rental car company that is used; f) to control the amount of days it should take to repair a vehicle.

335. NB: Some tow companies own their own repair shops or have an agreement between the body shop and the tow company.

336. In Massachusetts, a vehicle owner has the right to choose any repair facility for the repair of their vehicle. Insurers and appraisers are also prohibited from requesting or suggesting that repairs be made in a specific repair shop.

337. In Massachusetts, therefore I have the absolute right to select a repair shop of my choice to make repairs. No insurance company or independent agent or representative or staff member of an insurance company or appraiser or anyone working for a tow company can legally refer me to or away from any specific repair shop or require that repairs be made by a specific repair shop or individual. (Reg 212 CMR 2:04(c) and MGL 26 8G).

338. As shown previously, Todisco has engaged in illegal steering by engaging in acts described in this section and elsewhere.

339. Todisco violated the law against steering in Massachusetts by insisting that I must use their repair shop. When I indicated that I preferred to use an independent shop, Todisco became angry and retaliated further by delaying payment of my damages and by frustrating the process of resolving my claim including skewing the email record to make it seem as if I was refusing, in an absolute sense, to have my vehicle repaired, when I simply indicated that I wanted my vehicle to be repaired at a shop of my own choosing.

### ii. Failure to Carry Required Insurance/Failure to Apply Required Insurance

340. I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

341. All tow companies in Massachusetts are required to, at a minimum, carry Garage Liability/Garage Keepers Legal Liability insurance ("GKLL"). The GKLL coverage takes care of damage to customers' cars caused by negligence of the towing company and its drivers.

342. Todisco failed to carry the required GKLL insurance to cover damages caused to vehicles by its tow truck operations or otherwise failed to refer my claim to an insurance company that covered my claim under a GKLL policy.

343. In either case, Todisco has violated the requirement of Massachusetts towing law designed to protect the public and safeguard their vehicles/property. NB: The purpose of this requirement is to ensure that the public is protected from unscrupulous tow operators. See **Exhibit 6 – Announcement by Massachusetts senators that tow company bill was passed to protect the public**

344. Todisco has engaged in bad faith gamesmanship in order to avoid paying for my vehicle damage and to abdicate its responsibility to protect me vehicle and to repair it in the event it has damaged it, which in this case it has done.

345. Todisco failed to file a claim with an insurance company that covered my claim. The insurance company it referred my claim to, denied my claim because Todisco did not carry the required insurance policy to cover my claim. This is not only bad faith but a violation of Massachusetts Tow Company laws. It could also constitute fraud on me (as the consumer), if not also insurance fraud. NB: To the extent that Todisco may have committed insurance fraud, this could implicate a criminal violation by Todisco.

346. The Massachusetts Department of Public Utilities monitors tow companies for failure to adhere to maximum rates and charges, failure to file proof of insurance and failure to file an annual financial form.

347.  According to the regulations promulgated by Massachusetts Department of Transportation (MassDOT) for Towing and Related Services, the following shall be adhered to by towing companies:

    a.  Tow companies shall maintain the following minimum levels of insurance:

        i.  $750,000 combined single limit bodily injury and property damage.

        ii.  $100,000 Garage Keeper's liability.

        iii.  Worker's Compensation insurance.

        iv.  $1,000,000 General Liability insurance.

    b.  Proof of insurance shall be in the form of a certificate of insurance. Policy expiration or cancellation shall constitute immediate grounds for a tow company to have its license to operate as a tow-truck operator revoked.

    c.  The tow company shall provide adequate security of vehicles and property at the place of storage. A fenced and lighted area shall be provided, with indoor storage available. The tow company is solely responsible for the reasonable care, custody, and control of any property contained in towed or stored vehicles. NB: Consequently, a tow company cannot unilaterally shift liability for damage to a vehicle caused by the tow company or the damage or theft caused to vehicle while in the custody and care of the tow company, by requiring a customer to sign a waiver of said liability. It is a MassDot/state-mandated requirement that tow companies carry the risk of liability for any damage it causes to a vehicle while the vehicle is in the custody and care of the tow company. Therefore, this works as an estoppel against any claim by Todisco that I signed away my right to pursue a claim of damage to my vehicle while it was in the care and custody of Todisco.

    d.  The primary storage facility shall normally be at the same location as the business address.

    e.  Any current tow company's failure to satisfy any requirement(s) shall constitute a violation of MassDot requirements and is grounds for its immediate removal from the list of tow companies that the state will do business with.

348.  According to the regulations promulgated by Massachusetts Department of Transportation (MassDOT) for Towing and Related Services, a major violation (requiring suspension or termination) includes lapse of required insurance, causing unnecessary damage to vehicle, violation by driver while on duty, and charging more than regulated rates. See **Exhibit 4 – Excerpt from RFP showing regulations/guidelines for Tow Companies by Massachusetts Department of Transportation (MassDOT)**.

349.  Todisco has failed to carry the required insurance and/or caused its insurance to lapse or has intentionally misdirected me to an insurance company that does not cover the required garage liability that applies to my claim. This is a major violation of MassDOT regulations.

**iii.  Failure to Comply with Massachusetts Towing Regulations Pertaining to Charging of Costs to the Consumer for Trespass Tows and The Proper Recording of Time on Tow Slips.**

350.  I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

351.  Massachusetts regulations (220 CMR 272.00: M.G.L. c. 159B, § 6B; c. 266, § 120D), in section (6) states:

    To apply a fuel surcharge, the towing slip shall record the following: (a) each applicable rate and charge relating to Fuel-burning Operations of the Service Vehicles and a sum total; (b) the amount of the authorized Fuel Surcharge Factor; and (c) the amount of the applicable surcharge (the product of multiplying the sum total from 220 CMR 272.05(6)(a) by 220 CMR 272.05(6)(b)).

352.  See **Exhibit 5 – Massachusetts Regulations 220 CMR 272.00: M.G.L. c. 159B, §6B.**

353.  Hence, the calculation of the fuel surcharge involves multiplying the authorized Fuel Surcharge Factor by the *applicable rate and charge relating to Fuel-burning Operations of the Service Vehicles and a sum total.*

354.  On the tow slip provided by Todisco, Todisco records the following:

| Description | Details | Quantity | Price | Total |
|---|---|---|---|---|
| Fuel Surcharge | | 1 | 1.40% | $1.51 |

355.  Also, recorded elsewhere on the tow slip is the tow truck odometer readings as follows:

| | |
|---|---|
| Truck Start Odometer: | 50708.00 |
| Truck End Odometer: | 50710.00 |

356.  This means that the tow truck only traveled 2 miles total round trip.

357.    Based on the above, Todisco failed to record each applicable rate and charge relating to Fuel-burning Operations of the Service Vehicles and a sum total. Todisco also failed to multiply the authorized Fuel Surcharge Factor by the applicable rate and charge relating to Fuel-burning Operations of the Service Vehicles and a sum total. Todisco did not comply with the rate to be charged for fuel.

358.    Also, a violation occurs when the tow operator uses a calendar clock rather than a 24-hour clock which is required by M.G.L. c. 159B, § 6B. See **Exhibit 3 – Massachusetts DPU Bulletin Update on Tow Regulations in 2017.**

359.    Todisco did not use a 24hr clock on the tow slip and thus violated M.G.L. c. 159B, § 6B.

### P. Summary/Conclusion of this Section

360.    I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

361.    Todisco had a duty to treat my vehicle with care.

362.    Todisco engaged in other unfair and deceptive practices that have caused me harm. These acts constitute flagrant acts of deception or fraud. Todisco as described herein has engaged in the taking advantage of me as a consumer and in the violation of my consumer rights.

363.    As a result of Todisco's unfair and deceptive acts and practices, I have incurred substantial damages and costs.

364.    Todisco's conduct was a violation of Chapter 93A.

365.    Todisco's actions were willful and knowing violations of Chapter 93A and/or that its refusal to grant relief upon demand was made in bad faith.

366.    Todisco frustrated, delayed, and took advantage of me to further Todisco's own pecuniary interests and I suffered harm as a result.

367.    I am entitled to an award of damages in an amount to be determined at trial, plus interest and costs as provided by law; I am also entitled to an award of double/treble damages and attorneys' fees on my claims.

368.    NB: Todisco has hired lawyers to assist them to avoid liability and payment for the damages. Todisco would rather pay lawyers more money than what they owe me to pay for the damage to my vehicle. This is an abuse of situation and is bad faith conduct. It is an abuse of corporate power and is an example of how corporations misuse their power and privilege in society to visit havoc, distress, and wrongs upon a vulnerable public.

### COUNT 4 – AIDING AND ABETTING 93A VIOLATIONS AND 93A VIOLATIONS
### (MAPFRE)

369.    I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

370.    Under Massachusetts law, a defendant may be liable for aiding and abetting a tort where (1) a third-party committed the relevant tort; (2) the defendant knew the third-party was committing the tort; and (3) the defendant actively participated in or substantially assisted in the commission of the tort.

371.    MAPFRE is liable under G. L. c. 93A both for deceit and misrepresentations, and for failure to comply with the replacement policy notice requirements set forth in 211 Code Mass. Regs. §§ 34.00 et seq.

372.    MAPFRE engaged in unfair claim settlement practices in violation of Chapter 176D, and thus is liable under Chapter 93A, Section 9. Specifically, plaintiff alleges that, in denying the claim, MAPFRE insurance company failed to promptly settle the claim and that MAPFRE insurance company declined coverage to force plaintiff into litigation.

373.    Doe v. Brandeis Univ., 177 F.Supp.3d 561, 616 (D. Mass. 2016) (citing Go-Best Assets Ltd. v. Citizens Bank of Mass., 463 Mass. 50, 64, 972 N.E.2d 426 (2012) ; Restatement (Second) of Torts § 876(b) (1977) ).

374.    The defendants facilitated the violation of those rules by assisting in an unlawful business. Plaintiffs have pled facts sufficient to indicate, if proved, that defendants had knowledge that Todisco was committing torts. See also Boston Cab Dispatch, Inc. v. Uber Techs., Inc., 2015 WL 314131, at *6-7 (D. Mass. Jan. 26, 2015).

375.    Violations of G.L.c. 93A are possible whenever a consumer's injuries fall within a common law conception of unfairness. Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979).

### COUNT 5 - CIVIL CONSPIRACY
### (as to all defendants)

376.    I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

377.     Massachusetts courts recognize a tort of civil conspiracy that is a form of vicarious liability for the tortious conduct of others. Snyder v. Collura, 812 F.3d 46, 52 (1st Cir.), cert. denied, --- U.S. ----, 136 S.Ct. 2517, 195 L.Ed.2d 843 (2016) (citing Taylor v. Am. Chemistry Council, 576 F.3d 16, 34 (1st Cir. 2009) ). To state a claim for civil conspiracy, a plaintiff must allege that the conspiring parties agreed to or assisted in committing the underlying tort. Taylor, 576 F.3d at 35 (citations omitted).

378.     This type of civil conspiracy is more akin to a theory of common law joint liability in tort." Aetna Cas. Sur. Co., 43 F.3d at 1564. This form of civil conspiracy requires "a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement." Id., see, e.g., Kurker, 44 Mass.App.Ct. at 189-90 (holding plaintiffs stated a claim for civil conspiracy based on underlying tort of breach of fiduciary duty).

379.     Civil conspiracy is a very limited cause of action in Massachusetts. Jurgens v. Abraham, 616 F. Supp. 1381, 1386 (D.Mass.1985).

380.     To state a claim for this tort, a plaintiff must allege that "defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if acting independently." Id.

381.     Moreover, Massachusetts law recognizes the tort theory of "common design" in which a defendant may be liable for the tortious acts of another.

382.     To prove such a claim, two elements must be shown: first, that the defendant and others have agreed explicitly or implicitly to perform the act or achieve the particular result; second, that the defendant's "own conduct must be tortious." Payton v. Abbott Labs, 512 F. Supp. 1031, 1035 (D.Mass.1981).

383.     To prove their claims for civil conspiracy, the plaintiffs must show an underlying tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement. Kurker, 44 Mass. App. Ct. at 188-189.

384.     Todisco, either alone or in concert with the other defendants, held a "power of coercion" they would not have had they acted independently. By including the other defendants in the scheme to defraud the plaintiff, Todisco augmented its power to coerce or influence the plaintiff in order to effectuate a scheme to harm the plaintiff.

385.     The defendants agreed to perform or achieve tortious ends with respect to the plaintiff, including tortious misrepresentation. The false statements also form the basis of a conspiracy claim. See Massachusetts School of Law at Andover, Inc. v. American Bar Association, 952 F. Supp. 884 (D. Mass. 1997).

386.     Plaintiffs have been harmed by Defendants' actions.

387.     As a direct and foreseeable consequence of Defendants' actions, the plaintiff has suffered damages.

388.     As a result thereof, the plaintiff has been and continued to be injured and suffer damages.

## COUNT 6 - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (as to all defendants)

389.     Plaintiff, repeats and reiterates each and every allegation of the complaint, in the above paragraphs with the same force and effect as if herein set forth at length.

390.     To prevail on a claim of intentional infliction of emotional distress, a plaintiff must show "(1) that the defendants] intended to cause, or should have known that [their] conduct would cause, emotional distress; (2) that the defendants'] conduct was extreme and outrageous; (3) that the defendants'] conduct caused [her] distress; and (4) that [he] suffered severe distress.

391.     To be considered extreme and outrageous, the defendants'] conduct must be beyond all bounds of decency and . . . utterly intolerable in a civilized community." Howcroft v. City of Peabody, 51 Mass.App.Ct. 573, 596 (2001).

392.     Intentional infliction of emotional distress requires "extreme and outrageous conduct intentionally or recklessly cause[d] severe distress to another."

393.     Defendants knew that making false accusations that plaintiff frivolously accused Donais of racism, would damage the plaintiff's reputation and subject him to contempt or ridicule.

394.     Defendants have caused harm to plaintiffs, including stress, loss of sleep, emotional upset, anxiety, etc.

395.     Defendants caused or created emotional distress for Plaintiffs.

396.     Defendants intentionally inflicted emotional distress on plaintiffs, as a direct and proximate result of Defendants actions and inactions.

397.    Plaintiffs was caused to suffer severe emotional distress as the result of which a reasonable person in plaintiff's position would have suffered similar emotional distress under like circumstances.

398.    Plaintiffs sustained damages as a result of Defendants' intentional infliction of emotional distress on them.

399.    Plaintiffs has been harmed by Defendants' actions including lost opportunities, mental pain and suffering, being placed in anxiety, mental anguish, emotional distress, loss of enjoyment of life, lack of energy, mood swings, and sleep disturbances.

400.    Alternatively, plaintiffs plead a negligent infliction of distress claim, relying upon the same facts and elements of an intentional infliction of emotional distress claim.

401.    As a direct and foreseeable consequence of Defendants' actions, the plaintiffs suffered damages.

402.    As a result thereof, the plaintiffs has been and continued to be injured and suffer damages.

403.    Todisco owed a duty of care to me under the circumstances existing.

404.    Todisco breached that duty of care through its negligent conduct.

405.    Todisco has caused or created emotional distress for me. I suffered emotional distress and harm as a result of Todisco's negligence.

406.    Todisco knowingly caused me emotional distress by making false statements about prior damage to my vehicle and by delaying the resolution of my claim.

407.    Todisco further created emotional distress by sending my claim to an insurance company that it did have coverage with, resulting in the insurance company contacting me to inform me that it denied my claim. This left me with the impression that I would not get any relief whatsoever unless I filed a lawsuit.

408.    [NB: After consideration of legislative changes to Chapter 93A made in 1979, the SJC, in Hershenow v. Enterprise Rent-A-Car Co. of Boston Inc., 840 N.E. 2d, 526 (2006), stated these changes were "intended to permit recovery when an unfair or deceptive act caused a personal injury loss such as emotional distress, even if the consumer lost no 'money' or 'property'].

409.    Hence, Todisco intentionally misrepresented the nature of its relationship with MAPFRE/Commerce insurance in order to further frustrate, delay and ultimately get out of paying my damage claim. By doing so, Todisco engaged in deceptive conduct and violated 93A.

410.    Similarly, by proposing a resolution to my claim that was misleading, disingenuous, legally unenforceable and futile because it had no applicable policy with MAPFRE/Commerce, Todisco violated Chapter 93A. This proposal or course of action by Todisco was knowingly "doomed to fail", and thus was in violation of Chapter 93A.30 See also Piers v. Wheeler and Taylor, Inc., 8 Mass. Law Reporter 410 (1998) ("Representing to a buyer of a home that the property is free of lead-contaminated paint without verifying that fact constitutes willful misconduct subjecting the seller and the seller's real estate agent to multiple damages under c.93A.").

411.    Todisco intentionally inflicted emotional distress on me when as a direct and proximate result of Todisco's actions and inactions, I was caused to suffer severe emotional distress as the result of which a reasonable person in my position would have suffered similar emotional distress under like circumstances.

412.    I have sustained damages as a result of Todisco's intentional infliction of emotional distress to me.

## COUNT 7 - COMMON LAW FRAUD
### (Todisco, Pasquale Todisco, Don Doe Defendants)

413.    I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

414.    Two types of common-law fraud are recognized in Massachusetts. The first is fraud based on coercion or undue influence. See, e.g., Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 464 (1997) (stating the elements of fraud based on undue influence).

415.    The second is fraud based on deceit, which requires the plaintiff to show that the defendant "made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to [his] damage." Totalizing Sys. v. PepsiCo, Inc., 29 Mass.App.Ct. 424, 431 (1990).

416.    The defendants in this case have engaged in both types of common law fraud.

417.    Intentional common law fraud is related to the claim of unfair & deceptive acts under 93A and as such carries a potential award for attorney fees and up to treble damages.

418.   Common law fraud can be the basis for a claim of unfair or deceptive practices under the statute, see PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975); Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 504 (1979), and an intentional fraud can constitute a basis for the multiplication of damages.

419.   A finding of intentional common law fraud is an appropriate basis for a multiple damage claim of unfair or deceptive practices under G. L. c. 93A, the Consumer Protection Act.

420.   The fine print at the bottom of the invoice was not negotiated but was unilaterally inserted at the bottom of the invoice by Todisco. NB: Incorporated into this claim are several additional arguments, such as the fact the agreement was an improper contract of adhesion since I did not have a meaningful opportunity to negotiate it. Todisco's invoice was effectively a take-it-or-leave-it offer, no negotiation of the fine print on the invoice took place, and I had no bargaining power as a person who had their vehicle involuntarily towed by Todisco. The boilerplate language of the fine print on Todisco's invoice was not negotiated nor was there any opportunity for me to consult a lawyer before signing the invoice. The disparity in bargaining power between the parties is evident. I was also under duress.

421.   I had no lawyer present to review the fine print of the invoice. The invoice was only presented to me to sign after I had already paid the fee with my credit card. I had no ability to bargain or negotiate the fine print. But I was led to believe that none of the fine print would even matter because it did not apply.

422.   Todisco induced me to sign the invoice by telling me that I was simply certifying that I was legally authorized to take possession of the vehicle and that I was simply signing as "payer", indicating that I had paid the fee to the pick-up the vehicle.

423.   Then, after more than one year had passed, for the first time, Todisco asserted that it refused to pay my claim because I had signed a contract waiving liability for damage to my vehicle (i.e. by invoking the fine print as a basis to assert that I had waived liability).

424.   This meets the definition and criteria for intentional common law fraud.

425.   Todisco induced me to sign an invoice by misrepresenting that it was only a receipt and that it had no intention to invoke the fine print at the bottom of the invoice, by unilaterally inserting the fine print at the bottom of the invoice, by presenting the invoice to me after I had already paid the retrieval fee and immediately before requiring that I sign it. There were no negotiations of the invoice or the fine print on the invoice. Moreover, in the circumstances, Todisco's fraudulent assurances, and deceptive acts, resulted in my signing the invoice purportedly only as a receipt.

426.   As shown in case law for a common law claim of fraud, I was entitled to rely on Todisco's representation that the fine print on the invoice did not apply, especially because the fine print was unilaterally drafted and placed at the bottom of the invoice and was only shown to me immediately prior to Todisco's request that I sign it.

## COUNT 8 – CIVIL RACKETEERING (RICO) CLAIM
### (All Defendants)

427.   I hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

428.   The Racketeer Influenced and Corrupt Organizations Act of 1970, commonly known as RICO, although most known to be used in criminal law context, has a component that allows anyone to file suit in civil court if they have been a victim of racketeering, which encompasses more than 30 individual illegal acts or crimes, from bribery to fraud.

429.   The RICO statute contains a provision that allows for the commencement of a civil action by a private party to recover damages sustained as a result of the commission of a RICO predicate offense.

430.   To bring a RICO civil suit, a plaintiff has to show that a person or business is conducting the affairs of an enterprise through a pattern of racketeering, and that they were harmed by members of an enterprise who committed a pattern of at least two illegal acts.

431.   The standard of proof (the preponderance of the evidence) is low, rather than beyond a reasonable doubt.

432.   Both the criminal and civil components allow the recovery of treble damages (damages in triple the amount of actual/compensatory damages) plus attorney's fees.

433.   There are four basic elements to a civil RICO claim: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." In re Lupron Mktg. and Sales Practices Litig., 295 F. Supp. 2d 148, 163 (D. Mass. 2003) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 496 (1985)).

33

434.   A "pattern of racketeering activity" requires, at a minimum, two related predicate acts committed within ten years of one another. 18 U.S.C. § 1961(5). See also Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A., 94 F.3d 721, 731-32 (1st Cir. 1991). The statute "defines 'racketeering activity' as violations of specified federal laws, such as the mail and wire fraud statutes." Atl. Acquisitions, LLC v. J.H. Reid Gen. Contractor, 909 F. Supp. 2d 32, 35 (D. Mass. 2012). Such predicate acts must be related to one another and pose a threat of continued criminal activity.

435.   "Civil RICO is an unusually potent weapon," Miranda v. Ponce Fed. Bank, 948 F.2d 41, 44 (1st Cir.1991), requiring proof of a pattern of racketeering- activity consisting of at least two predicate criminal acts. H.J., 492 U.S. at 232, 109 S.Ct. 2893.

436.   A plaintiff may show "open-ended" continuity by showing that "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future [or] ... are part of an ongoing entity's regular way of doing business." Id. at 387 (quoting H.J., 492 U.S. at 242, 109 S.Ct. 2893).

437.   NB: In 2019, A recent complaint that shows how broadly the law can be applied to areas far outside organized crime is the RICO lawsuit filed in December against Harvey Weinstein, the Weinstein Company and its directors, and others. The complaint accuses them of helping Mr. Weinstein cover up a pattern of sexual harassment through what it calls the "Weinstein Sexual Enterprise." The class action, filed on behalf of women who dealt with Mr. Weinstein, claims that the enterprise was designed "to harass, threaten, extort and mislead both Weinstein's victims and the media to prevent, hinder and avoid the prosecution, reporting or disclosure of his sexual misconduct." In the Weinstein case, the plaintiffs claim that part of covering up the harassment involved obstruction of justice and "multiple instances of mail and wire fraud" to show the criminal pattern, and that by acting to help Mr. Weinstein, the defendants formed an enterprise alleged to be an "association in fact."

438.   Several state and federal fraud statutes make it a crime to engage in a "scheme or artifice to defraud," so proving deceptive conduct can be the basis for a RICO lawsuit, including in many cases, being misled in ways involving mail or wire communications, such as emails or bank transactions, that formed a pattern of racketeering activity.

439.   Todisco racketeering acts have been repeated extensively with members of the public and has been going on for years and will likely continue into the future indefinitely. This is part and parcel of the way how Todisco does business.

440.   In this case, Todisco (including employees Pat Todisco, Matthew Mazzarella and Don, along with others) have contrived a scheme to defraud me, and the public, by engaging in a pattern of illegal conduct and racketeering activity. See **Exhibit 2 – Complaints of Other Consumers (on BBB and Yelp) Showing That They Were Subjected to The Same or Similar Tactics & Showing Pattern of Conduct by Todisco.**

441.   This includes fraudulent activity using email and the internet directed at consumers and the public, designed to delay, frustrate, extort, and mislead consumers whose vehicles were damaged when towed by Todisco, in order to prevent, hinder and avoid payment of damages to vehicles caused by Todisco and its employees and agents.

442.   Similarly, the MAPFRE/Commerce insurance company is being used by Todisco as part of its scheme to deny consumers coverage of payment for vehicle damage. Todisco sends claims to MAPFRE who then denies these claims because it has no applicable policy to cover said claims. See **Exhibit 1 – Denial email by MAPFRE from Stephanie Wojdag.**

443.   On information and belief, many consumers are not sophisticated enough to realize said scheme or to fight back with the necessary legal action in court, and thus they are defrauded and deprived of their rights by Todisco. See Schubach v. Household Finance Corporation, 375 Mass. 133 (1978) ("We reject the argument that an act or practice which is authorized by statute can never be an unfair or deceptive act or practice under Section 2 (a) of G. L. c. 93A. The circumstances of each case must be analyzed, and unfairness is to be measured not simply by determining whether particular conduct is lawful apart from G. L. c. 93A but also by analyzing the effect of the conduct on the public.").

444.   Bennett & Belfort, have consistently assisted and represented Todisco in a variety of legal matters including communicating with consumers harmed by the racketeering acts of Todisco, and they are aware of these schemes and devices used by Todisco. Todisco's lawyers have engaged in written communications to me (in response to my requests that Todisco's pay the damages that I sustained from Todisco) that included blatant

falsehoods, misleading statements, outright lies and assertions of a fabricated or twisted record of the facts, and this shows that Bennett and Belfort are complicit in this fraudulent enterprise of illegal and unconscionable racketeering activity. Lawyers are not shielded when they are complicit in criminal or unlawful activity, when they participate in it or provide cover for it.

445.   Bennett and Belfort have also engaged in bad faith conduct in dealing with me in responding to my communications with Todisco, in violation of the rules of professional conduct.

446.   Bennett and Belfort has also breached their duty to be fair and to be truthful with me as a party seeking payment of damages from Todisco.

447.   Bennett and Belfort have also delayed and dragged out their response to my several written communications, refusing to answer or respond for extended period of time resulting in extreme delay and harm to the plaintiffs.

448.   Bennett and Belfort's act of refusing to respond to me for several months was calculated to harm me and to frustrate me so that I would give up on seeking payment for damage to my vehicle.

449.   Based on all of the foregoing, Todisco has engaged in a predatory fraudulent scheme to deny consumers payment for damage to their vehicles caused by Todisco. Evidently, this constitutes a pattern and practice, forming part of a racket by Todisco designed to defraud and scam the public via these unfair and deceptive practices. See **Exhibit 2 – Complaints from Other Consumers (on BBB and Yelp) Showing That They Were Subjected to The Same or Similar Tactics by Todisco.**

## COUNT 9 - BREACH OF CONTRACT AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (as to all defendants)

450.   Plaintiffs re-allege and incorporate all paragraphs above as if fully set forth herein.

451.   The defendants have contended that there was a contract between Todisco and plaintiff. Assuming arguendo that there was a contract between the Defendants and plaintiff, then it was forced contract of adhesion that the defendants required the plaintiff to sign before she could retrieve her vehicle.

452.   Assuming arguendo there was a contract as per the above, the defendants have breached the contract and/or the implied covenant of good faith and fair dealing.

453.   The law recognizes an implied covenant of good faith and fair dealing in all contracts, either expressed or implied.

454.   Defendants owed to Plaintiffs a duty of utmost good faith and fair dealing and thereby was obligated to consider the welfare of Plaintiffs, to refrain from acting for purely selfish motives or private gain, and to desist from destroying or injuring the right of the Plaintiffs to receive the fruits of the contract.

455.   As cited in prior paragraphs, Defendants engaged in conduct designed to oppress and harm the plaintiff in this case.

456.   Similarly, every additional breach or wrongful act that flowed out of the above is also a breach of implied contract and a breach of the covenant of good faith/fair dealing.

457.   Similarly, the defendants breached this implied contract and the attendant covenant of good faith and fair dealing.

458.   Through his actions and inactions, Defendants breached its duty of good faith and fair dealing to plaintiffs, intentionally engaged in wrongful conduct, and did knowingly injure or otherwise harm Plaintiff's rights and interests.

459.   By the conduct alleged herein, Defendants breached the implied covenant of good faith and fair dealing and caused harm to plaintiffs.

460.   As a result, Plaintiffs have suffered damages.

## V. CONCLUSION

461.   Todisco's conduct, as asserted herein, constitutes unfair and deceptive acts or practices in violation of Chapter 93A, section 2 and 9. As a result of this conduct, I have been damaged in an amount to be determined at trial, which includes without limitation loss of use, and other reasonable costs. I have also suffered emotional distress. By law, anyone violating the 93A statue is liable for up to three times the amount of damages, together with courts costs and reasonable attorney's fees.

462.   I provided Todisco two 93A demand letters in 2021, long before 30 days prior to this date of the filing of this lawsuit, and Todisco has not made a reasonable offer of settlement or has reneged on making an offer of settlement, in bad faith, thus leaving the plaintiff without any relief or settlement.

463.   Similarly, I provided MAPFRE with a 93A demand letter,  and MAPFRE has not made a reasonable offer of settlement.

464.   As a result of the above-described acts, the plaintiffs suffered, continue to suffer, and will in the future suffer damages in an amount to be determined by a jury at trial.

465.   Plaintiffs is also entitled to reasonable attorney fees pursuant to statute.

WHEREFORE, Plaintiffs respectfully prays that the Court grant the following relief:

(1) Enter judgment in Plaintiffs' favor and against Defendants for: any and all damages acceptable by law, including compensatory damages, statutory damages, punitive damages, pre-judgment interest at the legal rate, post-judgment interest at the judgment rate, attorney's fees as may be awarded by the Court, the costs of this action, equitable relief, relief pleaded in the preceding paragraphs, injunctive relief, and such other and further relief as Plaintiffs may be entitled to by bringing this action.

(2) Award damages within the jurisdictional limits of this court and enhanced damages as appropriate.

(3) Award reasonable attorneys' fees and costs including service and filing fees.

(4) Grant a pro se liberal construction to this pleading.

(5) Order such other relief as this Court deems just and equitable.

Respectfully submitted by plaintiff,

679 Washington Street, Suite # 8-206
Attleboro, MA 02703
781-492-5675

Respectfully submitted by plaintiff,

679 Washington Street, Suite # 8-206
Attleboro, MA 02703
781-492-5675

Dated: June 25, 2023

# EXHIBIT 1

Email from MAPRE Insurance
stating that my claim is being denied because Todisco
did not have proper coverage

4/14/2020                                    Mail - Liberty _6 - Outlook

## RE: CIC Claims Claim THXJ60, Insured's Name: TODISCO SERVICES INC

Wojdag, Stephanie <SWojdag@mapfreusa.com>
Wed 2/26/2020 3:17 PM
**To:** Liberty _6 <liberty_6@msn.com>
**Cc:** Non-Task Mass/cgi <Non-TaskMass@notes.mapfreusa.com>
Please refer to my previous email on 2/25 as this is previously outlined.

**From:** Wojdag, Stephanie <<u>SWojdag@mapfreusa.com</u>>
**Sent:** Tuesday, February 25, 2020 3:26 PM
**To:** Liberty _6 <<u>liberty_6@msn.com</u>>
**Cc:** Non-Task Mass/cgi <<u>Non-TaskMass@notes.mapfreusa.com</u>>
**Subject:** RE: CIC Claims Claim THXJ60, Insured's Name: TODISCO SERVICES INC

Good Afternoon,

We are denying the claim as there is no coverage on the date of loss of 2/22/19 under Todisco's Business Auto
Policy with MAPFRE. They do not have the proper coverage with MAPFRE for this loss.

Kind Regards,

*Stephanie Wojdag*

Stephanie Wojdag
Claims Representative II
Commercial Physical Damage
MAPFRE Insurance
11 Gore Rd, Webster, MA 01570
Phone. 800.221.1605 Ext.  15093 | Fax. 508.671.1110
Email. <u>swojdag@mapfreusa.com</u>



MAPFRE | INSURANCE
The Official Auto Insurer of the Boston Red Sox

P A P E R L E S S

**From:** Liberty _6 <liberty_6@msn.com>
**Sent:** Wednesday, February 26, 2020 3:13 PM
**To:** Wojdag, Stephanie <SWojdag@mapfreusa.com>
**Cc:** Non-Task Mass/cgi <Non-TaskMass@notes.mapfreusa.com>
**Subject:** Re: CIC Claims Claim THXJ60, Insured's Name: TODISCO SERVICES INC

p.s.  I contacted the Department of Public Utilities (DPU) today and they told me that Acadia is the
insurance company for Todisco.  If so, then why are you being involved in this matter?  The law requires
Todisco to carry garaging liability insurance, which would cover the damage at issue in this matter. You
stated or implied that Todisco has a business auto insurance policy with you.  Does Todisco have
garaging liability insurance with you?  Please confirm that you are the correct insurance company to
handle this matter.

# Exhibit  2 – Complaints of Other Consumers (on BBB and Yelp) Showing That They Were Subjected to The Same or Similar Tactics & Showing Pattern of Conduct by Todisco.

# Complaints from Other Consumers on Better Business Bureau

# Consumer Complaint# 1



**[Text from above screenshot reproduced below]**

**Complaint Type:** Problems with Product/Service
**Status:** Answered

05/09/2019

Vehicle (****) was towed to a storage lot from a downtown resident parking spot, without owner's consent. Upon owner's arrival at the storage location, the vehicle was inspected and it was discovered that damage (scratched bumper and missing paint) was inflicted on the front bumper/valence on the passenger side. This damage was undoubtedly inflicted by the tow truck operator and/or company personnel. Upon reporting the issue to the lot attendant, he laughed openly and mocked the owner.

Response
05/16/2019

Hello,The tow was requested by Boston Public Works and approved by City of Boston Police for being in violation of the posted street cleaning schedule in the City of Boston.  There are permanent signs posted all year long which detail the months, days and times where street cleaning is to occur.  Further, Residents may go to the City of Boston website to look up the schedule: https://www.cityofboston.gov/publicworks/sweeping/ and can even request text notifications.  Moving forward, I would suggest the vehicle owner utilize this service and pay closer attention to all posted signs before parking.Regarding the damage, could you please provide pictures of the alleged damage so we may inspect to see if it is consistent with damage occurred while towing as well as compare to the pictures we have?  Thank you.

Customer Response
05/18/2019

Better Business Bureau: I have reviewed the response submitted by the business and have determined that the response does not satisfy or resolve my issues and/or concerns in reference to complaint # ********. Please add your rejection comments below.  Boston parking law and the enforcement of them has nothing to do with this complaint. Nobody has disputed whether this was a legal tow. The complaint speaks to the poor customer service treatment that the owner received and the damage inflicted to the vehicle while in tow operator's possession. The on-duty attendant accepted a claim of damage at the tow lot and took photos of the damaged area. The assumption is that those photos are attached to the claim for the tow operator's review. Regards.

## Consumer Complaint# 2



**[Text from above screenshot reproduced below]**

**Complaint Type:** Problems with Product/Service
**Status:** Unanswered

01/18/2019

Sep 14, 2018 my car **** ***** plt #****** was towed from Chelsea employee parking lot - *** ******* *** ******* ** *****, ###-###-#### by Todisco Towing - 94 Condor St, East Boston, MA 02128, ###-###-####, http://www.todiscotowing.com Sep 16 I paid approximately $215 and got my car back. (They needed to move the SUV in front of my car and demolished the front of it.) A few days lather my neighbor (********* ********) told me the car is leaking oil (Photo-18+4 days). I checked oil level - it was higher(I thought that could be the reason), and read in internet about related issues, mostly gasket leaks. Oct 10-20 my son parked his car on my spot and I parked behind him (Photo-17 days). Oct 25 I got under my car and found out there is a crack in my oil pan (Photos) and temporary patched it. There was damage also on the transmission box (Photos). Oct 30 I filed claim in the tow company. Nearby auto shop gave mi estimate $475 to replace the oil pan, **** **** **** asked $850 to do it. Daily rent a car is $35 i was told. Todisco never call me back and didn't answer to my claim and calls. I was there twice and call them more then dozen times. Finally I call my insurance that told me they are denying they caused this damage to my vehicle(E-mail). The character of the damage(Photos) and the number of oily spots(Photos), matching the days, undoubtedly (100%) prove the towing did the damage. The reason is probably negligence, pure training, no control, but from what I saw could be also alcohol or drugs.

# Complaints from Other Consumers on Yelp

# Consumer Complaint #1



**Amanda A.**
Boston, MA
♀ 9 friends
⭐ 20 reviews
📷 15 photos

↪ Share review
‹› Embed review

12/22/2014

Worst tow company in Boston... Not that you expect a tow company to be good but these guys are completely irresponsible, tow AWD cars incorrectly, mess up your car, and then do not make any effort to try to fix it. Total scumbags. We got towed all the way to East Boston on a Sunday, drove it out of the parking lot and my 2013 Nissan sounded like it aged 50 years. Come to find out they WRECKED the couplings and axel. They gave us the run around, told us to take it to our dealership in Lawrence, then Ben, the "damage" manager did not respond regarding damage until I got the City of Boston Transportation Dept. Now I have a rental and my insurance is paying $1,500 until they can collect from to discos insurance- what a joke and totally a waste of time. If it's up to me, they won't be contracted with the city for much longer.

😊 Useful 5    😄 Funny    😎 Cool

todisc

📞 (617)

◆ Get D

You Might A
Sponsored

## Consumer Complaint #2



**A V.**
Boston, MA
0 friends
4 reviews

Share review
Embed review

todisc

(617)

Get D

12/12/2018

car damage by towing. this was confirmed by my dealer where I had my car repaired. filed a complaint. Tedisco said i need to submit it personally, which I did. Called multiple times. They kept on saying that their manager is not there and that they will call me back. I left my number every time but still no response. I have submitted my complaint last September. Called multiple times up until November but still no response. I would appreciate any response.

Useful 6     Funny     Cool

You Might A
Sponsored

**Maria M.**
Jamaica Plain, MA
1 friend
21 reviews

9/13/2017

Avoid, avoid, avoid!
Called for a tow and was told 45 minutes to an hour.
An hour later I called and was told it would be another 20

Type here to search

## Consumer Complaint #3



**Paula R.**
**Charlestown, MA**
0 friends
7 reviews

10/22/2016

this towing company does quite a lot of damage to cars when they tow them and they will not take responsibility for the damage.  Their drivers are rude and nasty as nasty can be.  They have not even towed me, but I have watched them tow  people in the neighborhood.  Don't support them!! If you have Triple A tell them you will not use them.  Too many other choices out their.  They actually break into cars

Useful     Funny     Cool

**Susan H.**
**Beverly, MA**

8/4/2011

## Consumer Complaint #4



**V S.**
San Francisco, CA
215 friends
8 reviews

11/12/2017

They are the worst. May totally damage your car when they tow it. The women who sits at the front desk doing nothing is literally the worst. She will try to charge you for invalid things. And she will ask you for payment before sharing any information with you. ASK HER what you are paying for. Demand to see the itemizations, and scrutinize it CLOSELY.

Useful    Funny    Cool

**Lori T.**
Lynn, MA
166 friends
28 reviews
1 photo

10/5/2015

I had a flat tire at the East Boston Stadium. Called Triple A at 6:15, they said that they would be sending someone out to fix my flat tire with the hour. I waited 3 1/2 hours for Todisco Towing to fix my flat tire. I was alone in the dark for 3 1/2

## Consumer Complaint #5



**Scott S.**
Boston, MA
3 friends
33 reviews

10/20/2018

Very horrible and disrespectful employees. They have treated me, other people and cars with utter disregard. Living next to a parking lot, I see Todisco come around all the time to damage and disrupt. Makes me sad to see that a business like this is allowed to operate.

Useful 6    Funny 1    Cool

**Suzanne L.**
Boston, MA
216 friends
12 reviews
27 photos

5/13/2018

Just hung up with somebody on the phone the only guy that's in the office for the night and he doesn't even know how to do his job he hangs up the phone on me wow aren't you professional I guess I'll call tomorrow and talk to somebody that knows how to do their job this place is the worst what a joke

## Consumer Complaint #6

 4/12/2018

Worst towing company in Boston.  No only do they have disrespectful employees, but they robbed my car.  A $1200 MacBook was stolen from my vehicle after it was towed. AWFUL COMPANY.

Useful 6     Funny     Cool

 8/9/2017

## Consumer Complaint #7



🡕 todiscotowing.com

📞 (617) 567-0700

📍 Get Directions

**Useful 6**   **Funny 9**   **Cool 5**

**Shannon B.**
East Boston, MA
1 friend
12 reviews
2 photos

5/2/2012

The worst! They are the only company that tows in my neighborhood during street sweeping and they charge $130ish for you to get your car back. The last time my car was towed, I picked it up less than 2 hours after it arrived and they still charged for a full day of "storage". Bull**** made up "policy" put in place to make an easy killing.  But whatever, I'm getting my revenge...

**Useful 8**   **Funny 1**   **Cool**

**Coba W.**
San Francisco, CA
1 friend
37 reviews
1 photo

11/5/2009

1 photo

I blew two tires driving over a curb turning into a turnpike on-

**You Might Also Consider**
Sponsored

Ralph J Galante Ins
4.3 miles

Joe U. said "Was re
great find! Moved all
business insurance.

Auto Body Squad

# Exhibit   3

# Massachusetts DPU Bulletin Update on Tow Regulations in 2017.



THE COMMONWEALTH OF MASSACHUSETTS
## DEPARTMENT OF PUBLIC UTILITIES

**CHARLES D. BAKER**
GOVERNOR

**KARYN E. POLITO**
LIEUTENANT GOVERNOR

**MATTHEW A. BEATON**
SECRETARY OF ENERGY
AND ENVIRONMENTAL AFFAIRS

ONE SOUTH STATION
BOSTON, MA 02110
(617) 305-3500

**ANGELA M. O'CONNOR**
CHAIRMAN

**JOLETTE A. WESTBROOK**
COMMISSIONER

**ROBERT E. HAYDEN**
COMMISSIONER

## BULLETIN

TO:        Carriers Performing Involuntary Towing

FROM:      Brian F. Cristy, Director, Transportation Oversight Division

DATE:      March 20, 2017

SUBJECT:   Department Tow Audit Program

Recently the Transportation Oversight Division ("Division") of the Department of Public Utilities ("Department") began an audit program devoted to ensuring that tow companies holding a Certificate of Compliance issued by the Department adhere to the proper rates for involuntary tows pursuant to M.G.L. c. 159B § 6B and 220 C.M.R. § 272.00. In order to conduct the audit in fair manner, each month the Division's Towing Auditor selects a number of tow companies at random and then sends an audit notification letter to the selected tow companies requesting the submission of 90 days of tow slips/invoices. The Towing Auditor then reviews the tow company's submitted documents against the Department's tow regulations, 220 CMR § 272.00, to identify any violations. As of February 28, 2017, the Department has completed 41 tow audits. Thus far, the Division has identified over $500,000 in violations, and each of the 41 audited tow companies has paid a fine and signed a Consent Agreement.

The Department has determined that the vast majority of violations identified center around mileage charges, storage charges, and, to a lesser extent, labor charges associated with charging for extra time or an extra person at the scene of the tow without properly recording beginning and end times on the tow slips/invoices.

First, regarding mileage charges, many tow slips indicated that mileage beyond the

first five miles of a tow was charged, however, the beginning and ending odometer readings from the towing vehicle were not recorded. Although the Department understands that many tow companies currently use the trip odometer readings to record mileage, 220 C.M.R. § 272 requires that the actual service vehicle odometer readings be recorded on the tow slip and be used to calculate mileage.[1]

Second, the Department found that some tow slips indicated that the tow company included the first five miles of the tow in the total miles charged for the tow. This is in violation of 220 C.M.R.§ 272, Table 1, which specifically states that the rate per mile over five miles is $3.00 per mile. Therefore, in many instances, the tow company should have reduced the total miles charged by 5 miles.

Third, there were several instances where the tow slips indicated that the towed vehicle was properly charged at $35.00 per 24 hour period for storage, as required in M.G.L. c. 159B §6B, but did not indicate when the vehicle was released. It is important to include the release date on the tow slip in order to prove that the tow company charged the correct amount for storage. Something as simple as a "P/U (date)" on the bottom of a tow slip will prove the amount of vehicle storage being charged. Also, please keep in mind, a violation occurs when the tow operator uses a calendar clock rather than a 24 hour clock which is required by M.G.L. c. 159B, § 6B. 

Finally, with regard to the labor charges for extra time and/or an extra person during an involuntary tow, the Department found many instances where either the beginning or end times were recorded on tow slips, but not both. There were also instances where the times were not included on the slip at all. The failure to record this information on a tow slip is in violation of 220 C.M.R. § 272.00, Table 1 & NOTE 1.[2]

The purpose of the Division's tow audit program is to ensure that regulated tow carriers performing "involuntary" tows adhere to the requirements established by statute, rules and regulations including, but not limited to, charging the correct amounts and

---

[1]   220 C.M.R. § 272, NOTE 3, states that "mileage is based on round trip mileage from garage to return thereto. The carrier will establish the mileage from the service vehicle odometer and must include the odometer readings on the tow slip."

[2]   220 C.M.R. § 272.00, Table 1 states "Rate Per Man Hour: $32.00 or any fraction thereof. Additional Labor is to be computed from time of leaving the carrier's garage until return thereto. Minimum charge - One Hour." 220 C.M.R. § 272.00, NOTE 1 states "A $35.00 per half-hour per vehicle charge may be assessed after one hour at the scene when necessary to remove the disabled vehicle; or if requested by police or other public authority. Starting and ending time must be recorded on the tow slip."

providing consumers with proper documentation.  To assist carriers, enclosed please find copies of relevant state statutes and Department regulations specific to involuntary tows.

# Exhibit 4 – Excerpt from RFP showing regulations/guidelines for Tow Companies by Massachusetts Department of Transportation (MassDOT).



**MASSACHUSETTS DEPARTMENT OF TRANSPORTATION (MassDOT)**
**HIGHWAY DIVISION**
**10 PARK PLAZA**
**BOSTON, MA 02116**

**REQUEST FOR RESPONSE (RFR)**

**DOCUMENT TITLE:  Emergency Towing and Related Services**

**COMMBUYS Bid#: BD-17-1030-0H100-0H099-00000009217**
**Agency Document Number: 95805**
**Release Date:  7/25/16**

**This Procurement is accordance with the World Trade Organization Procurement Agreement**

> Please Note: This is a single document associated with a complete Bid (also referred to as Solicitation) that can be found on www.COMMBUYS.com.  All Bidders are responsible for reviewing and adhering to all information, forms and requirements for the entire Bid, which are all incorporated into the Bid.  Bidders may also contact the COMMBUYS Helpdesk at COMMBUYS@state.ma.us or the COMMBUYS Helpline at 1-888-MA-STATE.  The Helpline is staffed from 8:00 AM to 5:00 PM Monday through Friday Eastern Standard or Daylight time, as applicable, except on federal, state and Suffolk county holidays.

• If at another location, there shall be no charge for any additional distance traveled to and from a secondary location.

• All companies shall have storage capabilities within the Commonwealth of Massachusetts.   Before using new storage facilities that are not listed on the application, the tow company shall obtain the Station Commander's approval and furnish the address of the storage facility to the Station Commander.

Tow companies shall maintain the following minimum levels of insurance:

- $750,000 combined single limit bodily injury and property damage;

- $100,000 Garage Keeper's liability;

- Worker's Compensation insurance;

- $1,000,000 General Liability insurance shown on MCS-90 form (Category III   companies only);



• Proof of insurance shall be in the form of a certificate of insurance. Policy expiration or cancellation shall constitute immediate grounds for a company's removal.   The insurance policy shall provide for immediate notification to the Station Commander in the event that the insurance policy has expired or has been cancelled.

In the event that a member of the State Police determines that a tow is not required in any given situation and cancels tow services subsequent to a request, no charges shall incur as a result of said cancellation. Instead, the tow company shall be placed next on the service list.   The state police has the absolute discretion to cancel any requested tow or related services for any reason.

Any tow company which presently appears on an existing tow list shall satisfy all State Police Tow requirements within one (1) year after the promulgation of said requirements.   Any current tow company's failure to satisfy any requirement(s) shall be grounds for its immediate removal from the tow list.

The inclusion on a Station Tow Company List of the Massachusetts State Police does not constitute, in any manner, a legal agreement or contract.  It should be understood that a company's inclusion on a list does not create a property interest of any kind.  The Massachusetts State Police have the absolute discretion and reserve the right to remove, FOR ANY REASON, any company on a Station Tow Company List.  These "agreements" are not contracts but are "understandings" between entities.

**Purpose**
To establish and define guidelines for State Police officers engaged in towing vehicles.

**Policy**
Public safety is the Department's primary concern and shall guide the application of this policy. When authorized to remove vehicles, officers shall remove such vehicles to an area which shall ensure the safety and well-being of the occupants, security of the vehicle, and allow for safe and efficient flow of traffic.

All personnel and approved tow companies shall adhere to and comply with all Division Commanders' Standard Operating Procedures relating to towing, as well as the Department of State Police Tow Service Agreement SP 357.

Nothing in this policy shall prevent personnel assigned to Troops E and F from adhering to the specific towing regulations of the public authority that they serve.

**Causes for Removal**

Page 19

**Document Sensitivity Level: High** during development; **Low** once published.

# Exhibit  5 – Massachusetts Regulations for Tow Companies (220 CMR 272.00: M.G.L. c. 159B, § 6B)

220 CMR:  DEPARTMENT OF PUBLIC UTILITIES

220 CMR 272.00:      RATES FOR THE TOWING OF MOTOR VEHICLES

Section

272.01:  Definitions
272.02:  Scope
272.03:  Maximum Charges for Passenger Automobiles, Motorcycles, Motor Bikes or Motor Scooters
272.04:  Maximum Charges for Commercial Motor Vehicles
272.05:  Fuel Price Surcharge

272.01:  Definitions

Commercial Motor Vehicle.  A motor vehicle or combination of motor vehicles used to transport passengers or property.  This shall include:
(a)  a bus or van used in commerce, having the manufacturer's rated seating capacity of at least nine passengers and a driver;
(b)  a truck used to transport property; or
(c)  any other vehicle which may display a plate other than a passenger or motorcycle plate.

Fuel-burning Operations.  The services included in the basic tow rate, rate for tows in excess of five miles or the charges otherwise established in sections 220 CMR 272.03(1) through (4).

Passenger Automobile.  A motor vehicle capable of transporting not more than eight passengers and a driver displaying a passenger or motorcycle plate.

Recovery.  Wrecker working, winching, Waiting Time, clean up time and the provisions of special equipment needed to place a disabled motor vehicle in position to be towed.

Service Vehicle.  The vehicle used to tow or transport the disabled vehicle.

Service or Waiting Time.  Elapsed time the Service Vehicle is waiting to provide service at the scene, winching or utilizing Service Vehicle equipped industry standard tools or equipment.

272.02:  Scope

The maximum charges established in  220 CMR 272.00 shall only apply to the towing and transportation of motor vehicles when said transportation is ordered by the police or other public authority pursuant to M.G.L. c. 159B, § 6B or for trespass pursuant to M.G.L. c. 266, § 120D. Rates stated in 220 CMR 272.00 shall not apply to towing which results from a call made by a police officer or other public employee at the request of the owner/operator to transport the vehicle to a location other than the carrier's garage.

If, at the scene, the owner/operator requests that the vehicle be transported to a location other than the carrier's garage, the maximum tow rate may not apply.

272.03:  Maximum Charges for Passenger Automobiles, Motorcycles, Motor Bikes or Motor Scooters

(1)  For all Passenger Automobiles, motorcycles, motor bikes, motor scooters and all vehicles capable of being transported by crane and dolly or on a ramp truck, the maximum charge for towing up to five miles shall not exceed $108.00 per vehicle towed regardless of day of week or time of day; provided however that, the maximum charge shall include one hour of Service or Waiting Time.  The Service or Waiting Time shall be computed from the time of arrival at the scene.

(2)  If Service or Waiting Time exceeds one hour, a $42.00 per ½ hour charge may be assessed for each vehicle towed when the additional time is necessary to remove the disabled vehicle or if requested by the police or other public authority; provided however that this charge shall not apply to trespass tows or snow removal tows.  The starting and ending time shall be recorded on the tow slip at time of service for 220 CMR 272.03(2) to be applicable.

220 CMR:  DEPARTMENT OF PUBLIC UTILITIES

272.03:  continued

(3)  If an additional Service Vehicle or Vehicles is required, the maximum additional Service Vehicle charge shall not exceed $108.00 per additional Service Vehicle; provided however that this charge shall not apply to trespass tows or snow removal tows.  The starting and ending time shall be recorded on the tow slip at the time of service for 220 CMR 272.03(3) to be applicable. Time shall be computed from the time the Service Vehicle is dispatched until it returns to the carrier's garage or is back in service.

(4)  For miles towed in excess of five miles, a surcharge of $3.60 per mile for each mile over the five miles may be assessed.

(5)  When additional labor is required and supplied because it is necessary to remove the disabled vehicle from the scene or is required by the police or other public authority, a maximum rate of $38.40 per man hour, or any fraction thereof, shall apply.  The additional labor shall be computed from the time of leaving the carrier's garage until return to the garage.  A minimum charge of one hour may be assessed when additional labor is supplied under 220 CMR 272.03(5).

(6)  If the carrier has to employ any extraordinary or additional services outside of its capabilities, including but not limited to, renting cranes, renting bulldozers, employing specialized labor, or utilizing services to handle hazardous material or dangerous goods (HAZMAT), the maximum charge shall not exceed the amount of such extraordinary or additional services.

(7)  When determining fractions of mileage under 220 CMR 272.03(1) and (4), omit fractions of less than 5/10 and increase fractions of 5/10 or more to the next whole figure.

(8)  Mileage shall be based on round trip mileage from the carrier's garage to return thereto.  If the Service Vehicle is dispatched from a location other than the carrier's garage, the one-way mileage may be doubled.  The carrier shall establish the mileage from the Service Vehicle odometer and shall include the odometer readings on the tow slip.

(9)  When more than one vehicle is transported on a Service Vehicle between municipalities and a mileage charge would result in a charge greater than five miles, the mileage charge shall be computed according to a commercial global positioning system (GPS) tracking application and then doubled to arrive at the round trip mileage.

(10)  The owner/operator shall be responsible for all toll charges.

272.04:  Maximum Charges for Commercial Motor Vehicles

(1)  For all Commercial Motor Vehicles, the maximum charge for towing up to five miles shall not exceed $108.00 per tow regardless of day of week or time of day.

(2)  For services necessary to the Recovery of a disabled Commercial Motor Vehicle, the carrier shall establish the charges.

(3)  For miles towed in excess of five miles, a surcharge of $5.40 per mile for each mile over the five miles may be assessed.

(4)  When determining fractions of mileage under 220 CMR 272.04(1) and (3), omit fractions of less than 5/10 or more to the next whole figure.

(5)  Mileage shall be based on round trip mileage from the carrier's garage to return thereto.  If the Service Vehicle is dispatched from a location other than the carrier's garage, the one-way mileage may be doubled.  The carrier shall establish the mileage from the Service Vehicle odometer and shall include the odometer readings on the tow slip.

(6)  The owner/operator shall be responsible for all toll charges.

220 CMR:   DEPARTMENT OF PUBLIC UTILITIES

<u>272.05:   Fuel Price Surcharge</u>

(1)    When the average cost of diesel fuel in New England exceeds $2.622 per gallon, the Department shall authorize a fuel surcharge under 220 CMR 272.00.  The Department shall calculate the fuel surcharge as a factor that may be multiplied by the sum of those applicable rates and charges relating to Fuel-burning Operations of the Service Vehicles.

(2)    The Department shall obtain the retail on-highway price per gallon of diesel fuel for New England as reported by the Energy Information Administration of the U.S. Department of Energy on its website, www.eia.doe.gov, for the first three Mondays of each month (Retail Prices).

(3)    The Department shall calculate the average cost of diesel fuel by taking the average of the Retail Prices as determined in 220 CMR 272.05 (Average Cost).

(4)    To determine the appropriate fuel surcharge factor, the Department shall divide the Average Cost by $2.622 to produce a multiplication factor (Fuel Multiplication Factor or FMF). The Fuel Multiplication Factor is then multiplied by $7.32, the embedded cost of fuel in the basic tow rate, to arrive at the current fuel cost per basic tow (Current Fuel Cost).  The Current Fuel Cost is then divided by the fuel-adjusted basic tow revenue requirement, which is the sum of the $108.00 basic tow rate, plus the product of the Fuel Multiplication Factor multiplied by $7.32, minus the embedded fuel cost of $7.32 (Fuel-adjusted Revenue Requirement).  Dividing the Current Fuel Cost by the Fuel-adjusted Revenue Requirement and subtracting the current embedded 6.8 % yields a fuel surcharge factor (Fuel Surcharge Factor) that may be applied in the next month to the sum of the applicable rates and charges relating to Fuel-burning Operations of the Service Vehicles.  This formula is mathematically represented as:  (($7.32 x FMF) ÷ ($108.00 + (($7.32 x FMF) - $7.32))) - .068 = Fuel Surcharge Factor.

(5)    On the fourth Monday of each month (or the next business day if this falls on a holiday) preceding a month in which the Department will authorize a surcharge, the Transportation Oversight Division will issue an Administrative Order setting forth the amount of the Fuel Surcharge Factor effective for the following calendar month by:
    (a)    posting on the Department's website the Fuel Surcharge Factor and the month and year for which it applies, where it will remain at least until the expiration of the month to which it relates; and
    (b)    recording a message accessible by telephone stating the Fuel Surcharge Factor and the month and year for which it applies, where it will remain at least until the expiration of the month to which it relates.



(6)    To apply a fuel surcharge, the towing slip shall record the following:
    (a)    each applicable rate and charge relating to Fuel-burning Operations of the Service Vehicles and a sum total;
    (b)    the amount of the authorized Fuel Surcharge Factor; and
    (c)    the amount of the applicable surcharge (the product of multiplying the sum total from 220 CMR 272.05(6)(a) by 220 CMR 272.05(6)(b)).

(7)    The authorization of the Fuel Surcharge Factor shall expire on the last day of the calendar month for which it is authorized.

(8)    The application of the surcharge is voluntary.


REGULATORY AUTHORITY

    220 CMR 272.00:  M.G.L. c. 159B, § 6B; c. 266, § 120D.

## Exhibit 6

# Announcement by Massachusetts Senators that Tow Company Bill was Recently Passed to Protect the Public.



## SENATOR MICHAEL O. MOORE

*Second Worcester District*

HOUSE          BOSTON, MA          0172...
H 09B

MEET MIKE    ISSUES & LEGISLATION    SERVICES
THE DISTRICT    COVID-19    NEWSROOM    CONTACT

# Moore-Sponsored Bill to Regulate Towing Industry Passes Senate

*March 23, 2018*



4/23/2020

Senator Mike MooreNewsroomMoore-Sponsored Bill to Regulate Towing Industry Passes Senate



*Legislation mandates proper safeguards and insurance for tow companies*



BOSTON — The Massachusetts State Senate took action to protect the motoring public by establishing a licensing mechanism for voluntary towing.



The bill, filed by Senator Michael O. Moore (D-Millbury) who serves as Senate Chair of the Joint Committee on Public Safety and Homeland Security, requires all companies, whether voluntary or involuntary, that perform towing services to hold a certificate from the Massachusetts Department of Public Utilities (DPU).  Presently in Massachusetts, anyone can purchase a tow truck and hold themselves out to be a tow company.

As it currently stands, only those companies that perform involuntary towing services, such as police-ordered tows after an accident or law enforcement related incidents where there is no one to drive the car, are required to have a DPU certificate, which mandates proper safeguards and insurance.  In addition, companies that provide involuntary towing services

4/23/2020

Senator Mike MooreNewsroomMoore-Sponsored Bill to Regulate Towing Industry Passes Senate

for the Massachusetts State Police are required to have a Criminal Offender Record Information (CORI) background and minimum insurance standards.

By requiring DPU to establish minimum insurance requirements and CORI standards for all tow trucks, the motoring public will know that there are safety standards in place when a tow company arrives to tow their vehicle.  In addition, by requiring tow companies to obtain a certificate, the Commonwealth will ensure tow companies are maintaining workers' compensation insurance and other legally required documentation.



"This bill is about public safety and consumer protection," stated Senator Moore. "By requiring the safeguard included in this legislation, we will ensure that when drivers are vulnerable and stranded on the side of the road, they can feel confident that their safety is the primary concern of the towing industry."

"The Massachusetts Senate is dedicated to ensuring consumer protections for residents of the Commonwealth," said Senate President Harriette L. Chandler (D-Worcester). "This legislation safeguards the well-being of drivers and their vehicles. I am very pleased that the Senate passed this bill."

"I thank the Massachusetts Senate for passing this important legislation that will ensure the safety of the motoring public," stated William Johnson, President of the Statewide Towing Association of Massachusetts. "This legislation will bring a uniform standard of accountability to the towing industry thus increasing public safety."

The legislation, which passed the Senate unanimously, has now been referred to the House of Representatives for consideration.  To continue tracking the bill,

4/23/2020                    Senator Mike MooreNewsroomMoore-Sponsored Bill to Regulate Towing Industry Passes Senate

S.2354, please visit the Legislature's website by
clicking below.

TRACK BILL

Share          0 Likes

← Shrewsbury Home Rule Bill Receiv...    Sen. Moore Supports Comprehensive ...



**OFFICE OF SENATOR MICHAEL O. MOORE**
STATE HOUSE, ROOM 109B
BOSTON, MA 02133
TEL. (617) 722-1485
FAX (617) 722-1066

© Copyright 2015-2019 Office of Senator Michael O. Moore.  This
website is the official website of Massachusetts State Senator
Michael O. Moore.  This website is maintained by the Office of
Senator Moore and has not been paid for at taxpayer expense.